[Cite as *Schmidt v. Crayne*, 2024-Ohio-4726.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Philip L. Schmidt, as Administrator
of The Estate of Joel Pasienza,
Deceased, et al.

Court of Appeals No. L-23-1194

Trial Court No. CI0202102800

Appellants/Cross-appellees

v.

John A. Crayne, M.D., et al.

**DECISION AND JUDGMENT**

Appellees/Cross-appellants

Decided: September 27, 2024

* * * * *

Carasusana B. Wall, Damon C. Williams, and
Ameena Alauddin, for appellants/cross-appellees

Jeff M. Smith, for appellee/cross-appellant,
John A. Crayne, M.D.

Brianna M. Prislipsky, Susan Blasik-Miller,
and Meredith Turner-Woolley, for appellee,
Toledo Clinic, Inc.

* * * * *

**MAYLE, J.**

**{¶ 1}** Following a jury trial, plaintiffs-appellants/cross-appellees, Philip L.

Schmidt, Administrator of the Estate of Joel Pasienza, Peter Pasienza, and Joanne

Pasienza, appeal the July 25, 2023 judgment of the Lucas County Court of Common

Pleas in favor of defendant-appellee/cross-appellant, John A. Crayne, M.D., and

defendants-appellees Toledo Clinic, Inc., Shakil A. Khan, M.D., and Fateh U. Ahmed, M.D. For the following reasons, we affirm.

## I. Background

{¶ 2} Joel Pasienza ("Joel") was a 37-year-old man who suffered from cerebral palsy and was nonverbal and non-ambulatory. He died on September 5, 2017, about five hours after being released from St. Anne Hospital, where he had spent 11 days undergoing treatment for a bowel obstruction. Following an autopsy, the Lucas County Coroner determined that Joel died of sepsis caused by klebsiella pneumoniae. Plaintiffs filed suit on February 12, 2019, against numerous health care providers, alleging medical negligence and wrongful death. They voluntarily dismissed their complaint without prejudice on June 4, 2021, then refiled on August 18, 2021, against only St. Anne hospitalist, Dr. John Crayne, and Toledo Clinic pulmonologists, Drs. Shakil Khan and Fateh Ahmed, along with their employers.

{¶ 3} Beginning July 10, 2023, plaintiffs' claims were tried to a jury. Those claims centered around their experts' opinions that (1) radiological imaging showed that Joel had pneumonia that his physicians failed to treat, and (2) this untreated pneumonia (specifically, klebsiella pneumoniae) led to sepsis, which caused Joel's death. Drs. Crayne, Khan, and Ahmed, and their hired experts, denied that Joel had pneumonia while hospitalized; they maintained that contrary to the coroner's ruling, he died of a massive aspiration.

2.

## A. Joel's Final Hospitalization

{¶ 4} According to the testimony offered at trial, on August 25, 2017, Joel presented to St. Anne Hospital's emergency department with abdominal pain. A CT and x-ray of his abdomen showed that he had a bowel obstruction. Joel was admitted to the hospital under the care of hospitalist, Dr. Crayne.

{¶ 5} While imaging was performed to determine the source of Joel's abdominal pain, his lungs, or portions of his lungs, were visible in the August 25, 2017 imaging. The radiologist who read the CT noted ""[m]ultiple bilateral lower lobe patchy airspace densities most suggestive of pneumonia." The radiologist who read the x-ray observed what "appear[ed] to be minimal bibasilar atelectasis." Atelectasis means that the lung is airless.

{¶ 6} On August 28, 2017, Joel underwent surgery for the bowel obstruction. He was administered cefazolin, an antibiotic given perioperatively, one gram every eight hours from August 28, 2017, through September 2, 2017. Because he was placed on a ventilator for the procedure, his surgeon ordered a pulmonology consult for post-operative care. Dr. Ahmed provided care from August 29, 2017, to September 1, 2017. His partner, Dr. Khan, took over Joel's care from September 2, 2017, until Joel's discharge on September 5, 2017.

{¶ 7} Joel was successfully extubated on August 29, 2017, and placed on room air. Portable chest x-rays were performed on August 28, 2017, August 29, 2017, August 31, 2017, September 1, 2017, and September 2, 2017. The reason provided for the August 28

3.

and 29, 2017 x-rays was that the patient was intubated. The reason provided for the remaining chest x-rays was the presence of an infiltrate.

{¶ 8} The radiologist who read the August 28, 2017 x-ray noted "mild left retrocardiac airspace disease. Lungs are otherwise clear." The report further stated that "[m]ild left retrocardiac airspace disease may represent pneumonia and/or atelectasis."

{¶ 9} The radiologist who read the August 29, 2017 x-ray noted "[n]o pulmonary venous congestion or edema. There are low lung volumes. Left retrocardiac opacity is unchanged. Blunting of the left lateral costophrenic angle is redemonstrated. No sizeable pleural effusion. No pneumothorax."

{¶ 10} The radiologist who read the August 31, 2017 morning x-ray noted "low lung volume exam. Stable dense retrocardiac airspace consolidation with stable blunting of the left lateral costophrenic angle."

{¶ 11} The radiologist who read the September 1, 2017 x-ray noted "[l]eft lower lobe atelectasis is . . . stable. Blunting of the left lateral costophrenic angle is . . . stable. Limited inspiratory volume of both lungs. Mild pulmonary vascular congestion."

{¶ 12} And the radiologist who read the September 2, 2017 x-ray noted "grossly unchanged left lower lobe atelectasis and small effusion." Joel's right lung was noted to be "relatively clear. No pneumothorax or free air."

{¶ 13} Joel's vital signs were monitored frequently during his hospitalization. For the most part, he was afrebile, except briefly on August 26 and 31, 2017, when he had a temperature of 100.4, and on August 29, 2017, where he twice had temperatures of 101.5 and 101.8. His oxygen saturation never fell below 90 percent. His respiratory rate stayed

4.

20 or below, except two readings on August 28 and 29, 2017, when it was 23 and 22, respectively. His pulse sometimes exceeded 100. And his blood pressures were often low. Joel's white blood count ("WBC") was normal, but for a couple of elevations post-operatively, and even then it was no greater than 11.3; a WBC of 3.5 to 11 is considered normal.

{¶ 14} At no time during this hospitalization was Joel treated for pneumonia. Of note, he had a history of aspiration pneumonia. He was admitted to St. Anne from May 21, 2017, to June 2, 2017 for aspiration pneumonia; Drs. Khan and Ahmed treated him during this time. When he was admitted in May, his temperature was 101.7, his oxygen saturation was 89 percent, his respiratory rate was 22, his pulse was 144, his blood pressure was 142/76, and his WBC was 15.

{¶ 15} Joel was also admitted to St. Anne from August 3, 2017, to August 8, 2017, for abdominal pain, and was seen there again on August 20, 2017, for the same complaint; Dr. Crayne treated Joel during his early August admission. Imaging was performed during his previous hospitalizations and visit. His most recent chest x-ray from August 20, 2017, noted that Joel's lungs were clear.

{¶ 16} Joel was discharged from St. Anne on the evening of September 5, 2017, and at approximately 6:00 p.m., he returned to Ann Grady Center, the facility where he lived. Daily documentation from one of his caregivers stated that "Joel had a good afternoon[,] was in bed[,] watched tv & napped. A lot of coughing[.] [N]o problems." However, Joel's condition changed at approximately 10:55 p.m. The nursing notes indicate that the nurse "[h]eard some gurgling - set up suction machine[.] Called JP's

5.

name - he turned his head toward me - took 1 deep breath and closed his eyes. Immediate color change noted to face. Pulse checked - unable to palpate. DSP called 911 - writer et DSP began CPR. AED brought to home by B home nurse. AED applied - CPR continued until Springfield Fire & Rescue arrived."

{¶ 17} Efforts to resuscitate Joel were unsuccessful. He was pronounced dead at 11:48 p.m. An autopsy was performed. The coroner ruled that Joel's death was caused by "sepsis (klebsiella pneumoniae (hours-day(s))." It listed significant conditions to include "acute pneumonia, complications of recent small bowel obstruction, spastic quadriplegia cerebral palsy."

## B. The Experts' Opinions

{¶ 18} The parties retained expert witnesses who provided standard of care and causation opinions. Plaintiff presented testimony from hospitalist, Mohammad Alhabbal, M.D.; infectious disease specialist, Julie Jordan, M.D.; forensic pathologist, Joseph Felo, M.D.; and pulmonologist, Hooman Poor, M.D. Dr. Crayne presented testimony from internal medicine specialist, Gordon Moss, M.D.; and infectious disease specialist, Keith Armitage, M.D. And Drs. Ahmed and Khan presented testimony from pulmonary critical care specialist, Johnathan Parsons, M.D.; and infectious disease specialist, Daniel Kaul, M.D.

### 1. Dr. Alhabbal

{¶ 19} Dr. Alhabbal, a hospitalist, opined that Dr. Crayne's care fell below the standard of care for a hospitalist because he failed to address bilateral opacities evident in the August 25, 2017 CT, which the radiologist noted were "most suggestive of

6.

pneumonia." He described the CT results as obvious and striking and said they should have been addressed. He testified that Joel had pneumonia upon admission to St. Anne, and this pneumonia and sepsis caused his death.

{¶ 20} According to Dr. Alhabbal, given Joel's history and risk factors for pneumonia and aspiration pneumonia, Dr. Crayne should have treated this condition as pneumonia until proven otherwise, and he should have consulted pulmonology with this suspicion at the beginning of Joel's hospitalization. Dr. Alhabbal opined that the failure to do so led to an evolving process, including the klebsiella pneumoniae and sepsis that caused Joel's death.

{¶ 21} On cross-examination, Dr. Alhabbal acknowledged that pulmonology was consulted and cared for Joel from the day after his surgery until his discharge, but he noted that this was at the surgeon's request and was because Joel was intubated—not because of the findings on the CT. He conceded that the emergency doctor did not diagnose pneumonia, nor did the surgeon or anesthesiologist who performed surgery for Joel's bowel obstruction.

{¶ 22} Although he described that Joel's vital signs were "not striking," Dr. Alhabbal characterized them as "fluctuating." He maintained that Joel's presentation was atypical and did not include the typical signs and symptoms of pneumonia—e.g., shortness of breath, elevated pulse, fever, sweating, elevated respirations, and elevated WBC—like those Joel experienced when he was hospitalized for aspiration pneumonia in May. He explained that an atypical presentation can be the result of chronic disease,

7.

frequent hospitalization, a history of coughing and aspiration, and the inability to express oneself.

{¶ 23} Dr. Alhabbal maintained that the August 28, 29, and 31, 2017 chest x-rays are consistent with pneumonia. He agreed that the radiologists who read the September 1 and 2, 2017 x-rays noted atelectasis, not pneumonia, but he emphasized that while these x-rays were read as evidencing "no significant changes," what this actually means is that Joel's condition never improved. Dr. Alhabbal was critical that no chest x-rays were ordered during the first few days of Joel's admission.

{¶ 24} Dr. Alhabbal agreed that a hospitalist would typically defer to a pulmonologist to diagnose and treat pneumonia, and the pulmonology defendants here agreed that it was appropriate to discharge Joel. Dr. Alhabbal also acknowledged that Joel was treated by respiratory therapists, who cleared his secretions, and this could explain coughing reported by Joel's parents and sputum described in the nurse's notes.

### 2. Dr. Jordan

{¶ 25} Dr. Jordan is an infectious disease specialist. She opined that Joel had pneumonia and sepsis before his September 5, 2017 discharge. She believes that if the pneumonia had been diagnosed and timely treated with appropriate antibiotics at the right dosage, it would not have spread through Joel's bloodstream and progressed to sepsis. Dr. Jordan provided no opinions regarding standard of care.

{¶ 26} Dr. Jordan explained that pneumonia is a lung infection caused by a virus or bacteria. Typical indications include fever, cough, and sometimes sputum that is

8.

yellow-green or brown. Pneumonia may be seen in imaging on either chest x-ray or CT scan.

{¶ 27} More specific to this case, Dr. Jordan testified that klebsiella pneumoniae is a gram-negative bacteria that can cause pneumonia, in addition to other infections. It is treated with antibiotics. If left untreated, it can spread throughout the body, go into the bloodstream, cause organ damage, cause an infectious, life-threatening condition called sepsis, and can cause death. A patient with sepsis will typically have low blood pressure, rapid pulse, and fever. The time it takes for an infection to develop from sepsis to ultimate death depends on many factors. According to Dr. Jordan, a person who has been hospitalized, has received antibiotics, has a weak immune system, and whose body does not function like normal people are at a higher risk for infection to progress quickly.

{¶ 28} Dr. Jordan opined that Joel had active pneumonia from klebsiella pneumoniae that was left untreated or partially treated, and spread through the bloodstream. She testified that her opinion is based on the CT scan, which was suggestive of pneumonia, reports that he was coughing, reports of low blood pressure, fever, and high pulse rate, reports of yellow-brown sputum, the autopsy report indicating an active infection and presence of klebsiella pneumoniae, and his risk factors for infection, including cerebral palsy, trouble swallowing, inability to verbalize, history of aspiration, and history of pneumonia.

{¶ 29} Dr. Jordan acknowledged that Joel received cefazolin, an antibiotic started as a prophylaxis for surgery, but she explained that it was not the proper dose and he did not receive the full course of antibiotics. The dose required to treat klebsiella

9.

pneumoniae is two grams every eight hours—less than that would be only a partial treatment. Joel received only one gram for only four days. She claimed that because the cefazolin partially treated the infection, it suppressed the WBC and fever.

{¶ 30} On cross-examination, Dr. Jordan disagreed that Joel's vitals on August 25, 2017, were inconsistent with an active infection. She described that Joel's blood pressure was low normal at admission, but at other times it was low; his pulse was persistently high, above normal; his respirations were high normal, and his oxygen saturation was low normal. Dr. Jordan pointed out that Joel's WBC rose after a few days in the hospital. She conceded that this was after surgery, which can happen, but she said that the physicians still needed to consider infection. Dr. Jordan acknowledged that cefazolin was stopped at 6:00 a.m. on September 2, 2017, and 72 hours after it was stopped, Joel's temperatures were all within normal limits. She claimed that his fever would not have spiked right away.

{¶ 31} Dr. Jordan recognized that blood pressure can fluctuate due to fluid shifting during surgery. She conceded that other vitals were either within normal limits or only slightly outside normal limits, but she pointed out that Joel's vitals were frequently flagged in the chart as abnormal. She claimed that his mean arterial pressure was indicative of sepsis. Dr. Jordan agreed that the only time that the color of Joel's sputum was documented, it was noted to be clear and thin. Other times it was not documented because he swallowed it.

10.

### 3. Dr. Felo

**{¶ 32}** Dr. Felo is a forensic pathologist. He agrees with the Lucas County coroner that Joel's cause of death was sepsis caused by klebsiella pneumoniae and that Joel had significant conditions that increased his risk of developing sepsis and contributed to his death, including acute pneumonia, complications of recent small bowel obstruction, and spastic quadriplegic cerebral palsy. Dr. Felo believes that Joel became infected while he was in the hospital, but before his discharge.

**{¶ 33}** Dr. Felo explained that pneumonia starts locally and expands out to the rest of the lungs. He did not know where samples of lung tissue (analyzed at autopsy) were taken from, so he does not know if the tissue samples came from the central organizing pneumonia. He conceded that the tissue samplings from the autopsy are not consistent with Joel having been infected with pneumonia as of August 25, 2017.

**{¶ 34}** Dr. Felo discussed some of the findings described in the autopsy report. He testified that the report described that the pulmonary parenchyma exuded large amounts of blood and pus, which he said is a sign of either a bacterial or fungal infection and is typical in cases of pneumonia. There were extravasated red blood cells, indicating that blood passed through the lungs, leaked through the capillaries, and filled Joel's air sacs. There was intra-alveolar edema, meaning that fluid had built within the air sacs, essentially preventing Joel from breathing. And there was diffuse polymorph nuclear cell infiltration of the bronchi and intra alveolar spaces, indicating that acute inflammatory cells were reacting to the bacteria or whatever was present in the lung tissues. Dr. Felo explained that these findings demonstrate the presence of fresh or acute pneumonia, and

11.

the presence of pus means that while Joel was alive, his body was reacting and trying to fight off the infection. This pus, fluid, and blood within his airways prevented Joel from breathing effectively.

{¶ 35} Dr. Felo opined to a reasonable degree of medical probability that Joel did not die of a massive aspiration event. He explained that aspiration means breathing or inhaling food, fluid, or vomit into the airway. Here, the tracheobronchial trees of the lungs were patent, meaning they were open and not filled with fluid, and no records showed that gastric fluid or vomit was involved in the cause of death. Dr. Felo explained that clinically, Joel would have been spewing, coughing, or gagging if he had experienced a massive aspiration.

{¶ 36} On cross-examination, Dr. Felo agreed that when a patient is resuscitated but passes away, there can be blood in the lungs. He acknowledged that a person can aspirate vomit or gastric fluids—it comes from the stomach and gets regurgitated and breathed into the lungs. These fluids enter the patient's trachea and effectively choke the patient, provided that they occlude the airway from the vocal cords all the way down into the lungs. He conceded that vomit was observed at autopsy.

{¶ 37} Dr. Felo agreed that aspiration can cause inflammation and death. He acknowledged that neutrophils and eosinophils are generally present at the site of inflammation, and he observed neutrophils and eosinophils on the slides he reviewed. He explained that neutrophils and eosinophils have a limited lifespan of about three days. Where an infection lasts nine to 11 days, more chronic inflammatory cells would be visible under the microscope and fewer neutrophils and eosinophils. The chronic

12.

inflammatory cells that happen after a person has been infected for nine to 11 days cause red hepatization, which appears as a beefy inflamed lung. With a bronchopneumonia infection lasting ten to 12 days, he would expect to see chronic inflammatory cells causing red hepatization. He did not see that in this case. Dr. Felo agreed that the autopsy is inconsistent with pneumonia that has been present since August 25, 2017, however, it remains his opinion that klebsiella pneumoniae sepsis was the cause of Joel's death.

### 4. Dr. Poor

{¶ 38} Dr. Poor is a pulmonologist. He opined that Drs. Ahmed and Khan deviated from the standard of care in their treatment of Joel, and Dr. Khan further breached the standard of care by discharging Joel prematurely. He believes that pneumonia was present on August 25, 2017, which led to sepsis and ultimately death.

{¶ 39} Dr. Poor explained that pneumonia is an infection of the airspaces of the lungs, whereas bronchitis is an infection of the airways. The airways are branched to prevent the inhaling of dust and microbes. Those things generally get trapped in mucus and coughed out. Coughing protects the airway and prevents these things from getting into the lungs. When a person's defense mechanisms break down, they can become at risk for developing pneumonia.

{¶ 40} Klebsiella pneumoniae is a bacteria commonly found in the gut. If bacteria is aspirated into the lungs, it can grow and wreak havoc. Sepsis is the body's inappropriate response to infection and is life-threatening.

13.

{¶ 41} Dr. Poor agreed with the radiologist who read Joel's August 25, 2017 CT that there were multiple airspace opacities that were highly suggestive of pneumonia. When airspace opacities are seen, the differential diagnosis includes fluid, blood, or pus. Pus in the airspaces is pneumonia, and pus was observed at autopsy. Dr. Poor compared the August 25, 2017 CT to the one performed three weeks earlier. He observed that there are findings in the second CT that weren't present in the first CT, which tells him that it wasn't scarring or chronic changes depicted in the August 25, 2017 CT. Dr. Poor opined that Joel should have been treated empirically for pneumonia or it should've been further investigated to determine whether it was pneumonia. It appeared to Dr. Poor that the August 25, 2017 CT was essentially ignored.

{¶ 42} Dr. Poor acknowledged that atelectasis and a lung filled with fluid or pus can look similar, but he explained that when there is a splotchy appearance, it is not atelectasis. He testified that both pulmonologists deviated from the standard of care by failing to address the pulmonary infiltrates and airspace opacities, and by failing to order a repeat CT scan to make sure the opacities were resolving. According to Dr. Poor, Joel should not have been discharged until the issue of the CT and chest x-rays was resolved, however, he testified that it was appropriate for a hospitalist to rely on the pulmonologists.

{¶ 43} Dr. Poor said that infections progress at varying rates. An infection may begin as mild and progress rapidly. He acknowledged that Joel was given cefazolin, which is not an appropriate antibiotic for the empiric treatment of pneumonia, but he

14.

claimed that the cefazolin partially treated the infection and kept it slightly at bay. The infection could worsen rapidly once the antibiotics were removed.

{¶ 44} Dr. Poor conceded that Joel did not exhibit signs of active sepsis during his hospitalization, but he opined that Joel's vital signs were not inconsistent with pneumonia because by the end of his hospitalization, his heart rate was in the hundreds, oxygen saturation was not completely normal, and his blood pressures were low.

{¶ 45} On cross-examination, Dr. Poor agreed that there are four criteria for sepsis and all four criteria were not met at the same time. There was no fever on the day of discharge, but he insisted that a person can have pneumonia without a fever. Although Joel's pulse was above 90, Dr. Poor agreed that an elevated heart rate is a nonspecific finding. Dr. Poor acknowledged that Joel's respiratory rate was not above 20, and his WBC was not greater than 12.

{¶ 46} Dr. Poor agreed that all the x-rays during the August admission looked relatively similar, but he said that there may have been some slight progression. He also agreed that the report for the September 1, 2017 x-ray did not mention opacities, and the September 2, 2017 report described atelectasis, not opacities. He pointed out that it also mentioned a small effusion which is fluid outside the lung. He emphasized the limitations of a chest x-ray.

{¶ 47} Dr. Poor acknowledged that at Ann Grady, Joel's blood pressure was not low, his temperature was 100.4, his pulse was 106, his respirations were 12, and he was coughing. He opined that the presence of the fever and pulse is consistent with sepsis but not septic shock. Dr. Poor did not rule out massive aspiration as part of the cause of

15.

death, but he said that there would have been a lot of vomit on autopsy if massive aspiration was the cause of death.

### 5. *Dr. Parsons*

{¶ 48} Dr. Parsons is a pulmonary critical care physician. He concluded that there was no breach of the standard of care by the pulmonologists and there was no reason to delay discharge. He opined that Joel did not have pneumonia in August. Dr. Parsons believes that Joel suffered a massive aspiration at Ann Grady and had a large inoculation of klebsiella pneumoniae into his lungs when he aspirated.

{¶ 49} Dr. Parsons went over the radiology findings for the chest x-rays. He described the August 28, 2017 x-ray as unremarkable. The report noted "mild left retrocardiac airspace disease, may represent pneumonia and/or atelectasis," but Dr. Parsons said that this was a common spot for atelectasis in a patient with an endotracheal tube. He opined that the report required no action.

{¶ 50} Dr. Parsons described the August 29, 2017 x-ray as fairly normal. He explained that "low lung volumes" is not clinically relevant in most cases involving an intubated patient and it just means that the lungs haven't expanded post-surgery. "[L]eft retrocardiac opacity is unchanged" suggests to Dr. Parsons stable, non-progressive atelectasis. If Joel had pneumonia upon admission on August 25, 2017, Dr. Parsons would expect worsening plus clinical indications of an untreated infection.

{¶ 51} In the August 31, 2017 x-ray, Joel's endotracheal tube had been removed. There was a stable area of atelectasis on the left, but the x-ray was otherwise unremarkable. If Joel had pneumonia, Dr. Parsons would have expected to see

16.

progressive changes after the tube was removed. The radiologist's report recommended follow up "if clinically relevant." Dr. Parsons would not have done anything further to follow up because there was no evidence of infection.

{¶ 52} The September 1, 2017 x-ray had a similar pattern to all the other ones. There were no new infiltrates and there was still persistent atelectasis on the left side. Dr. Parsons explained that atelectasis usually resolves over time once the patient is up and moving or can be treated by non-invasive therapies at bedside. Atelectasis is not life-threatening and patients in Joel's condition often have persistent low lung volumes and atelectasis.

{¶ 53} The September 2, 2017 x-ray indicates that Joel was supine, which means he was on his back. Low lung volumes are more common in patients lying down supine. But he sees the same pattern in this x-ray: low lung volumes, stable atelectasis, and no new infiltrates. The radiologist report says there were no infiltrates or abnormalities in the right lung. The August 25, 2017 CT said there were bibasilar infiltrates. If this was pneumonia, Dr. Parsons would not expect the right lung to be clear in the September 2, 2017 x-ray without antibiotics. One gram of cefazolin would not have cleared up the lung if it was pneumonia. The September 2, 2017 x-ray report also says there are no significant changes, which he agrees with, but it also said there was a "small effusion," which he does not agree with because there was no shortness of breath and Joel's vitals were stable.

{¶ 54} Dr. Parsons compared Joel's presentation from May to his presentation in August. In May, his pulse was 140, he had a fever over 101 degrees, his respirations 17.

were in the twenties, and his oxygen saturation was below 90. His CT and chest x-ray were also consistent with pneumonia. In August, the imaging is patchy and chronic looking. Also, the x-rays are markedly different than the May x-rays. When correlated with his vitals, the imaging does not necessarily suggest pneumonia.

{¶ 55} Doctors usually treat pneumonia with their best guess of antibiotics that they think will fight the infection without sampling the material that caused it. He does not agree that Joel should have been given antibiotics because his clinical presentation was not consistent with pneumonia. He had no fever, his oxygen saturation was normal, his heart rate was for the most part normal, and his blood pressure was normal. Physical exams were being performed daily. Although the pulmonologists heard rhonchi, this is nonspecific and would be expected in someone with a history of chronic aspiration. Dr. Parsons insisted that another CT was not needed because it was not clinically indicated.

{¶ 56} Dr. Parsons explained the different stages of sepsis. The first is SIRS (systematic inflammatory response syndrome). It requires evidence of two abnormal vitals at the same time in order to be significant. The second is SIRS plus presumed infection. Here, there was no evidence of a presumed source of infection. The third is severe sepsis. It requires sepsis plus some degree of organ dysfunction. Here, there was no evidence of organ dysfunction. The fourth is septic shock. It requires severe sepsis plus hypotension that does not respond to fluids. Dr. Parsons reviewed the Ann Grady records and found no evidence of septic shock. He noted that prior blood pressures that were low were not persistent or trending. He also noted that mean arterial pressures were above 65, and most critical care specialists use below 65 as a cutoff. Although Dr.

18.

Parsons agreed that the criteria of sepsis are often debated, he said that he has never seen a patient with sepsis who did not meet any of these criteria. There is a risk of death at all stages of sepsis.

{¶ 57} Dr. Parsons agreed that cough can be a sign of pneumonia, but he claimed that Joel's cough was not concerning for pneumonia because of his history of chronic aspiration. He also observed that Joel was treated by respiratory therapists. His cough was noted to be strong, which is good because it indicated that he was able to clear his airways. Dr. Parsons testified that Joel swallowed his secretions, so nurses and respiratory therapists were unable to assess color. Where color was noted, it was noted to be clear and thin, and therefore, unlikely to be related to an infectious process. There was no documentation of yellow, green, or brown sputum.

{¶ 58} Although Dr. Parsons acknowledged that Joel had been colonized with klebsiella pneumonia, he emphasized that Joel had a history of chronic aspiration. He believes that Joel suffered a massive aspiration at Ann Grady and had a large inoculation of klebsiella pneumoniae into his lungs when he aspirated. He said that a large amount of material from the stomach and esophagus spilled into the lungs, which can cause death suddenly. Dr. Parsons disagreed that the absence of vomitus at autopsy rules out massive aspiration as the cause of death, but he agreed that usually, vomitus will be observed on the patient's gown or clothes and in their mouth. As for the autopsy report noting a large amount of blood in the lungs, Dr. Parsons explained that this can be caused by CPR, and pus can find its way into the lungs from a massive aspiration plus CPR.

19.

**{¶ 59}** On cross-examination, Dr. Parsons acknowledged that air bronchograms are abnormal. He saw them in the September 2, 2017 x-ray, but not in any of the other serial x-rays. He noted that Joel had received Lasix to try to remove some fluid, so the presence of air bronchograms was not necessarily persistent.

**{¶ 60}** Dr. Parsons recognized that in May, Joel went to the hospital already very sick with pneumonia; he wasn't there for something else and they just happened to catch it. He agreed that the findings on the CT could not be ignored even though the CT was ordered for purposes of diagnosing Joel's bowel issue and happened to show portions of the lung.

**{¶ 61}** Even assuming that the family reported yellow or green sputum, Dr. Parsons theorized that it could be bile mixed with mucous, which would be consistent with Joel having had a small bowel obstruction, serious aspiration pneumonia in May, chronic coughing, and a history of underlying conditions that put him at risk of chronic, on-going aspiration.

### 6. Dr. Moss

**{¶ 62}** Dr. Moss is an internal medicine specialist. He opined that Dr. Crayne adhered to the standard of care in his treatment of Joel. He testified that once the pulmonologists became involved, those specialists were responsible for Joel's pulmonary care. Moreover, the pulmonologists and Joel's surgeon were consulted and agreed to Joel's discharge, so Dr. Crayne did not violate the standard of care by discharging Joel. Dr. Moss also opined that Joel did not have pneumonia on August 25, 2017, and he disagreed that Dr. Crayne should have prescribed antibiotics on an empiric basis.

20.

{¶ 63} Dr. Moss explained that a hospitalist is a generalist who is responsible for coordinating a patient's care among consulting physicians in various sub-specialties and is also responsible for coordinating discharge planning when the consultants agree that discharge is appropriate. Here, Dr. Crayne managed some of Joel's medical conditions and consulted other specialists for those that required a higher degree of specialization. Dr. Moss testified that a hospitalist should defer to consultants with a higher level of specialized training.

{¶ 64} Dr. Moss believes that basilar infiltrates visible in the August 25, 2017 CT were also present in films from May and early August. He also believes that Joel's clinical picture was not suggestive of pneumonia, infection, or sepsis. His WBC, respiratory rate, and oxygenation were all normal. His heart rate was only slightly elevated, which can also happen with a small bowel obstruction. He had a low-grade fever twice, after surgery, and a slightly elevated WBC for a day or two after surgery, both of which are normal.

{¶ 65} Dr. Moss testified that if Joel had untreated pneumonia during his hospitalization from August 25 to September 5, 2017, it would have produced overwhelming sepsis, and Joel's clinical course during his hospitalization was inconsistent with sepsis. His blood pressure would have been persistently low, and he would have experienced clinical deterioration and multi-organ failure; it would not have been subtle. Dr. Moss found nothing concerning about Joel's pulse and blood pressure. He explained that patients who undergo surgery for a bowel obstruction often experience

21.

fluid shifts that will affect pulse and blood pressure, and his surgeons would have been monitoring those numbers post-operatively.

{¶ 66} Dr. Moss opined that Joel died acutely of a massive emesis aspiration. He highlighted the presence of vomitus around the mouth and the observation that Joel was gurgling before he died. In his view, the autopsy does not confirm that there was pneumonia, and nothing suggests to him that Joel's death was the result of sepsis.

{¶ 67} On cross-examination, Dr. Moss opined that it was inconceivable that Joel had pneumonia as of August 25, 2017, yet he had a fever only on August 29 and 30, despite not being treated for pneumonia. He insisted that the dose of cefazolin Joel received would not have treated klebsiella pneumoniae. Dr. Moss conceded that Dr. Crayne did not consult pulmonology pre-operatively despite the CT results, but he clarified that the pulmonary service wasn't needed in the days preceding the surgery.

### 7. Dr. Armitage

{¶ 68} Dr. Armitage is an infectious disease specialist. He opined that Joel did not have an active klebsiella pneumoniae infection during his hospitalization. He reasoned that Joel's clinical course was not consistent with an active infection, and the Ann Grady charting was not consistent with klebsiella pneumoniae or sepsis. Dr. Armitage believes that Joel suffered an acute fulminant infection from a large aspiration with a high inoculum of klebsiella pneumoniae. This combination of klebsiella pneumoniae and aspiration caused rapid clinical deterioration within hours.

{¶ 69} Dr. Armitage testified that klebsiella pneumoniae does not cause atypical pneumonia—it quickly makes people sick and causes rapid deterioration. The

22.

pulmonologists sometimes described hearing rhonchi, but Dr. Crayne and the Ann Grady nurse described clear lungs. He explained that rhonchi can be temporary sounds related to secretions.

{¶ 70} Dr. Armitage testified that untreated sepsis evolves rapidly and can cause death at any stage in its progression. He opined that Joel was not septic during his hospitalization. He said that the Ann Grady notes do not describe a septic patient.

{¶ 71} Dr. Armitage explained that klebsiella pneumoniae would cause vital signs to deteriorate. He acknowledged that Joel had a temporary increase in temperature and WBC, but he emphasized that both resolved without treatment and neither would be unusual following abdominal surgery. Joel's intermittent low blood pressures could also be attributable to post-operative fluid shifts. While Dr. Armitage agreed that Joel's vitals varied somewhat, he said that if he had pneumonia, there would have been a pattern of deteriorating vital signs—a couple of isolated abnormalities is not consistent with pneumonia. Dr. Armitage addressed the fact that Joel had been coughing. He said that the treatments by the respiratory therapist would produce coughing and sputum.

{¶ 72} Dr. Armitage testified that most pneumonias are diagnosed from x-rays. If Joel had pneumonia, the serial chest x-rays would have shown progression; they did not. Although he conceded that the finding by the radiologist who read the August 25, 2017 CT required clinical correlation, Dr. Armitage maintained that there was no indication for a repeat CT scan.

{¶ 73} Cefazolin would not be used to treat pneumonia; it is aimed at skin or abdominal infections. It would not prevent fever or abnormal vitals if a patient had

23.

klebsiella pneumoniae. Dr. Armitage said that a broad spectrum antibiotic would be used to treat pneumonia. He explained that it is not good medical practice to prescribe antibiotics reflexively.

{¶ 74} Dr. Armitage opined that there are two explanations for Joel's death: (1) a massive aspiration without infection, or (2) a large aspiration event with acute infection and sepsis. Either way, the event was acute, not chronic, which means that it was not present on August 25, 2017. He believes it is more likely that that there was a large aspiration complicated by infection and sepsis. Dr. Armitage maintained that both the infection and the sepsis developed after he was discharged, while he was at Ann Grady. He explained that a large aspiration with a large inoculum can produce sepsis quickly.

### 8. Dr. Kaul

{¶ 75} Dr. Kaul is an infectious disease doctor. He opined that it was reasonable for Dr. Khan to agree to Joel's discharge. He disagreed with Dr. Armitage that sepsis developed between discharge and death. Dr. Kaul believes that Joel died of an aspiration event rather than progressive sepsis. He explained that the observations of the nurses at Ann Grady were particularly significant to his opinion because Joel's vitals looked good, he was responsive one moment, then he looked away and became unresponsive. Dr. Kaul explained that this is consistent with an aspiration event. He emphasized that it does not take a large amount of vomitus to cause death—just enough to plug up the airway. Vomitus around Joel's mouth at autopsy is consistent with a massive aspiration.

{¶ 76} Dr. Kaul explained that while sepsis can be somewhat unpredictable, there's a recognizable progression to it. He described that a person with sepsis will

24.

generally show signs and symptoms of infection; the process takes time and is very recognizable to medical providers. Although some bacteria can rapidly lead to sepsis, klebsiella pneumoniae is not one of them. He saw pictures of Joel playing cards in the hospital. Visually, he did not look like a patient suffering from sepsis. There would be signs of obvious distress.

{¶ 77} Dr. Kaul disagreed that Joel should have been given antibiotics empirically. He explained that antibiotics should be considered carefully before prescribing. He recalled that Joel was given cefazolin in connection with his surgery on August 28, 2017, until September 2, 2017. If he had an infection, there would have been a progression of his symptoms once the cefazolin was stopped.

{¶ 78} Dr. Kaul acknowledged that Joel had a low fever post-operatively, but said this is not something doctors would worry about. The overall tenor of his vitals was that he was improving overall and from a respiratory standpoint, was doing quite well. Moreover, intermittent low blood pressure is not indicative of severe infection and sepsis—he would expect to see persistent low blood pressure.

{¶ 79} Dr. Kaul saw no evidence of a purulent cough. A productive cough, even a colored cough, is common after extubation because the airway is irritated. To that end, if Joel had pneumonia, they would not have been able to extubate him so quickly. That Joel swallowed sputum does not affect Dr. Kaul's opinions.

25.

## C. The Treating Physicians

### 1. *Dr. Crayne*

{¶ 80} Dr. Crayne was Joel's attending physician during his final hospitalization. As Joel's hospitalist, he was charged with taking care of the things he could take care of and referring out the things he could not. In this case, a surgeon became involved to address Joel's bowel issues and the surgeon ordered a pulmonology consult as a matter of course because Joel was intubated and admitted to the ICU. Dr. Crayne acknowledged that Joel's surgery was performed on August 28, 2017, no pulmonology consult was requested before the surgery, and he did not consult pulmonology to address the August 25, 2017 CT findings.

{¶ 81} Dr. Crayne agreed that Joel had a history of hospitalizations for pneumonia, including aspiration pneumonia, and was at high risk of aspiration and pneumonia. It was Dr. Crayne's view that despite the August 25, 2017 CT findings, pneumonia was ruled out clinically. He said he followed Joel every day, assessed him, and looked at his vital signs. He testified that it is very difficult for a radiologist to make a firm diagnosis by simply looking at images, and he debated that the radiologist diagnosed pneumonia because the report said that what was seen on the CT was *suggestive* of pneumonia—not that it *was* pneumonia. Dr. Crayne explained that a diagnosis requires consideration of a patient's whole picture, including their clinical presentation, past medical history, individual physical condition, and risk factors, and the course of treatment is dictated by the clinical diagnosis. He did not order treatment for pneumonia because he did not believe that Joel had pneumonia.

26.

**{¶ 82}** Dr. Crayne agreed that he did not order a chest CT, did not order a chest x-ray, did not consult an infectious disease specialist, did not prescribe antibiotics, and did not order any cultures. He conceded that he did not create a plan of care to monitor Joel for resolution of abnormalities seen on the August 25, 2017 CT, however, he insisted that he was following him clinically and monitoring his vitals in looking at the big picture—*that* was the plan of care.

**{¶ 83}** Dr. Crayne acknowledged that the radiologist who reviewed the August 31, 2017 chest x-ray found that there was low lung volume and dense retrocardiac left basilar airspace consolidation; the radiologist recommended follow up. Dr. Crayne interpreted that as a recommendation to whoever ordered the test, which, in this case, was pulmonology. Dr. Crayne explained that if pulmonology didn't think follow-up was necessary, he would defer to their expertise.

**{¶ 84}** Dr. Crayne coordinated discharge planning for Joel and was responsible for signing off on discharge after speaking with other specialists. He agreed that the goal in discharge planning is to reduce the likelihood of readmission and provide for long-term care, which, in this case would mean follow up with his primary care doctor. Dr. Crayne testified that he did as thorough a job as he could and there is nothing he would have done differently here. He does not dispute the coroner's finding that the cause of death was sepsis, thus it is his position that Joel developed pneumonia that triggered sepsis after his discharge from the hospital.

27.

## 2. *Dr. Ahmed*

{¶ 85} Dr. Ahmed is a pulmonologist and critical care doctor. He cared for Joel from August 28 to September 1, 2017, and during his May hospitalization. After September 1, 2017, Dr. Ahmed transitioned Joel's care to Dr. Khan. Dr. Ahmed believes that given Joel's clinical picture, Joel died of a massive aspiration.

{¶ 86} Dr. Ahmed acknowledged that Joel had a history of pneumonia and was at high risk of aspirating, but the pulmonology consult was ordered by the surgeon here because Joel had been on a ventilator. Dr. Ahmed said that when he saw Joel the day after the surgery, the x-rays showed that the right-sided changes on the CT resolved and the changes on the left side were stable. He reviewed Joel's labs and the vital signs were all good, so he was able to extubate him.

{¶ 87} Dr. Ahmed described that to discern between postsurgical inflammation and other kinds of inflammation, he would look to clinical exams, labs, x-rays, and the patient's overall picture. He agreed that CTs have a higher level of detail than x-rays. Dr. Ahmed conceded that a radiologist can diagnose some things, like broken bones, but there are processes where the radiologist can provide his or her *impression,* but cannot make a diagnosis. For instance, a radiologist may describe that he or she is seeing an opacity, and may call it "a suggestion of pneumonia." He said that radiologists leave it to the clinician at the bedside to make the actual diagnosis.

{¶ 88} Dr. Ahmed testified that the clinical signs and symptoms of pneumonia, and their severity, may vary to a certain extent from person to person. It is possible for a patient to have more subtle symptoms of pneumonia. Coughing, and coughing up

28.

phlegm, can be a symptom of numerous conditions, including pneumonia, and should be documented if it is significant. Dr. Ahmed was not concerned about Joel's cough because the endotracheal tube itself irritates the throat, plus Joel's cerebral palsy affected his swallowing process and how he handled mucous and secretions; Joel could not effectively clear his throat. He does not recall the nurses reporting concern about Joel's cough, and the respiratory therapists were evaluating him and suctioning him on a regular basis.

{¶ 89} Post-surgery, Dr. Ahmed ordered serial x-rays because Joel had been intubated. He was not concerned that Joel had pneumonia, but he recognized that Joel had a risk of pneumonia as any post-op patient would. Dr. Ahmed explained that he was not just looking at Joel's lungs, he was also checking labs to make sure Joel was not developing bleeding, infection, pleural effusion (fluid outside the lungs), or pulmonary edema (fluid inside the lungs). Dr. Ahmed testified that Joel showed no signs, symptoms, or lab values that would cause concern about pneumonia. He said that he did not treat Joel for pneumonia because there was none to be treated.

{¶ 90} Dr. Ahmed believes that a shadow visible in the lung on the chest x-rays was atelectasis. He agreed that on an x-ray, it can be difficult to distinguish between pneumonia and atelectasis. He said that it can also be difficult to distinguish between pneumonia and pneumonitis. But Dr. Ahmed testified that one follow-up x-ray is sufficient to follow up on an opacity, and he would not have ordered a CT to distinguish between pneumonia and atelectasis. He explained that the x-ray was consistent with atelectasis. He pointed out that the radiologist started describing the findings as

29.

atelectasis as opposed to pneumonia. He believes the images were overread at first because the process initially visible on the right side was gone by September 2, 2017, and the process on the left side was not changing. Dr. Ahmed insisted that atelectasis stays the same; pneumonia doesn't. Moreover, he said that pneumonia would not simply go away on its own in three days without any treatment.

{¶ 91} Dr. Ahmed would expect Dr. Crayne to rely on his expertise in considering whether Joel had any lung issues. He confirmed that even if he had seen Joel on day one of his admission, he would not have diagnosed pneumonia, prescribed antibiotics, or changed the course of treatment in any way.

{¶ 92} Other of Dr. Ahmed's testimony will be more fully discussed in our analysis of plaintiffs' assignments of error.

### 3. Dr. Khan

{¶ 93} Dr. Khan is a pulmonologist and critical care doctor. He cared for Joel from September 2 through 5, 2017, and in May 2017 as well. Dr. Khan agreed that Joel had classic, bilateral pneumonia in May.

{¶ 94} When Dr. Khan took over Joel's care, he would have gotten a report from Dr. Ahmed. His practice is to review the patient's assessment, notes, and x-rays, review lab data, talk to nurses, make rounds with a nurse, try to get a hold of the respiratory therapists, and examine the patient. He writes his impression and plan. He does not recall if he looked at the CT images or just the report. Dr. Khan agreed that the patient's medical history and risk factors are important to consider, and Joel had a history of pneumonia and aspiration. He emphasized, however, that you would not treat a patient

30.

for pneumonia just because he had it in the past. He explained that he did not order an antibiotic because there was no reason to do so.

{¶ 95} Dr. Khan is familiar with klebsiella pneumoniae. It lives in the gut and gastrointestinal tract, but can travel to other parts of the body. In the lungs, it will usually be present in the upper lobes. Dr. Khan explained that Joel was given cefazolin prophylactically in connection with the bowel surgery because there is a lot of bacteria in the bowel that could spill into the peritoneum and into the bloodstream.

{¶ 96} Dr. Khan remarked that Joel got off the respirator easily, which is unusual. His oxygen saturation was excellent despite atelectasis. Dr. Khan did not order any additional x-rays, CTs, or blood tests after September 2, 2017, because Joel was showing progressive improvement and his labs were all fine. He said that he looked at the five x-rays and compared them to one another. Dr. Khan agreed that it is hard to distinguish between pneumonia and pneumonitis in a CT, but he disagreed that it's difficult to tell the difference on an x-ray between pneumonia and atelectasis. He described that on an x-ray, if the patient has pneumonia, he will usually see bronchograms.

{¶ 97} Typically, a patient with pneumonia will experience fever, shaking, chills, marked shortness of breath, tachypnea (rapid respiratory rate) in the 30s, and tachycardia (increased heart rate) in the 140s. There will also usually be bilateral infiltrates visible on the chest x-ray. He conceded that it is possible for a patient with pneumonia to be afrebile, but insisted that there will be other findings consistent with pneumonia.

{¶ 98} Joel was ready to be discharged on September 5, 2017. Nobody communicated to him any concerns about discharging Joel. Dr. Khan insisted that if he

31.

had had any doubts pulmonary-wise, he would have kept him in the hospital. From a pulmonary standpoint, it was appropriate for Dr. Crayne to rely on his determination that discharge was appropriate.

{¶ 99} Dr. Khan maintained that Joel did not have a pulmonary infection between August 25 to September 5, 2017. He disagrees that Joel died of sepsis with acute pneumonia. He believes that he died of an aspiration. He cited three facts in support of his position: (1) the Anne Grady notes, which demonstrate that Joel had good oxygenation, his blood pressure was normal, he was smiling and watching television until the caregiver heard gurgling, at which time Joel turned his head and stopped responding; (2) the autopsy report shows that there was vomitus around his mouth; and (3) the autopsy report shows that he had 200 cc's of fluid in his stomach, some of which went into his lungs.

{¶ 100} Medical interventions were described in the autopsy report and indicate that an endotracheal tube was placed. In attempting resuscitation, first responders would have cleared the airway to allow for placement of that tube.

{¶ 101} Other of Dr. Khan's testimony will be more fully discussed in our analysis of plaintiffs' assignments of error.

### D. Joel's Family

{¶ 102} Joel's mother, Joanne Pasienza ("Joanne"), testified at trial, as did his father, Peter Pasienza (Peter"), and his sister, Amanda Mashburn ("Amanda"). Plaintiffs ordered and filed the transcript of Joanne's testimony, but omitted Peter and Amanda's.

32.

There is no explanation in the record for why only a partial transcript of the trial testimony was ordered and filed.

{¶ 103} Joanne testified that Joel was coughing a lot in the hospital and "gunk" came out when he coughed. Hospital staff gave them a tube to suction Joel whenever they felt like he needed it. At her deposition, she described that Joel was gurgling. She did not remember if they had to suction him any more than usual on the day of discharge. She did not recall there being anything to suction him with that day. She and her husband saw him that night at Anne Grady. He did not sign to her that he did not feel well, but she said that before she left, Joel grabbed her hand tightly and squeezed it.

### E. The Verdict

{¶ 104} The jury rendered a defense verdict. Interrogatories indicate that it found that the doctors did not breach the standard of care in their treatment of Joel. As such, the jury did not reach the issue of whether a breach of the standard of care proximately caused Joel's death.

{¶ 105} The Pasienzas assign the following errors for our review:

First Assignment of Error: The trial court committed reversible error by allowing testimony from the defendants that lacked foundation, was inadmissible hearsay under Evid.R. 803, and should have been excluded pursuant to Evid.R. 403.

Second Assignment of Error: The trial court committed reversible error by misinterpreting a stipulation by the parties and excluding testimony about the reliability of the medical documentation evidence.

33.

Third Assignment of Error: The trial court committed reversible error through the cumulative effect of its evidentiary decisions.

Dr. Crayne assigns the following error for our review:

The trial court erred as a matter of law when it denied Dr. Crayne's Motion for Directed Verdict, because Plaintiffs failed to put forth evidence establishing proximate cause.

## II. Law and Analysis

{¶ 106} Plaintiffs' assignments of error challenge the trial court's evidentiary rulings. In their first assignment of error, they argue that the court committed reversible error when it permitted Drs. Ahmed and Khan to testify about the contents of an EMS report that was not disclosed in the parties' exhibit lists. In their second assignment of error, they argue that the trial court committed reversible error when it prohibited them from introducing evidence concerning errors and discrepancies in Dr. Crayne's documentation. And in their third assignment of error, they argue that the cumulative effect of other individually-harmless errors resulted in cumulative error requiring reversal.

{¶ 107} In his sole assignment of error, Dr. Crayne argues that the trial court erred in denying his motion for directed verdict.

## A. Testimony About the EMS Report

{¶ 108} After plaintiffs rested and all the retained experts finished testifying, Drs. Ahmed and Khan testified in their own case-in-chief. Their attorney sought to utilize and admit into evidence the EMS report generated by the first responders who were

34.

dispatched in response to the 9-1-1 call from Joel's providers at Ann Grady. The report stated as follows:

Narrative
37 y/o Unresp. M. Staff at Ann Grady st. they were suctioning pt. airway because "It sounded gurgley" when they noted pt. "became limp and pale". Per staff they then started CPR. 1sts on scene upon arr. CPR initiated. Asystole initial rhythms per 1sts. Pt. ax. v/s, and COT as listed. 1sts st. initial $CO_2$=24 c BVM. Pt. initial $CO_2$=55 c King Airway. Pt. airway was suctioned multiple times to remove bile/emesis. IO est. Pt. given meds as listed. Pt. did convert into PEA c idioventricular as underlying rhythm. Approx. 30 min. on scene report radio was given to St. L's. Per Dr. Lumbreezer termination of effort OK'd. Time of Death 2348. Pt. left in care of LCSO and NH Staff's incident.

{¶ 109} At trial, plaintiffs objected to the admission of the EMS report and to "the contents of that document" because (1) the report was not disclosed on anyone's exhibit list; (2) the report did not constitute "medical documentation," the admission of which the parties had stipulated to; (3) it was a surprise document, offered by the doctors at a time when plaintiffs' medical experts were no longer available to testify, could not assist counsel to prepare for cross-examination, and could not, logistically, be recalled on rebuttal; (4) the doctors were unfairly advantaged because unlike plaintiffs, they had the medical knowledge to enable them to testify about the report without assistance from their medical experts; (5) there was no witness who could lay a foundation for its admission; and (6) the probative value of the evidence was outweighed by the danger of unfair prejudice.

{¶ 110} The trial court agreed that if the report was not disclosed, "the jury will not receive it." And ultimately, upon objection by plaintiffs, it did not admit the document or permit the defense to display it to the jury. However, the court permitted the

35.

doctors to testify about its contents. In their first assignment of error, plaintiffs argue that this was error requiring reversal.

{¶ 111} On direct examination, Dr. Ahmed testified that as a critical care physician, he runs codes to resuscitate people who have stopped breathing. He explained:

> Person who is not responsive, whose heart stopped, who is not breathing, very first thing we have to do is start the CPR. And the second step we have to do is make sure that they are able to get oxygen in their lungs or in the body. And to do that, we have to put tube which is made of plastic with the help of a scope and that tube we place from the mouth, going in their mouth.

Dr. Ahmed was asked about the procedure where a person has coded as the result of a massive aspiration. He described:

> So in that situation, first of all, it's hard to establish an airway or hard to put the tube in. When you lift the mouth, you look in the back of their throat, it's full of vomitus, so it's hard to see where the vocal cords are, where you have to put the tube. So in that case, we always when we are trying to put the tube in, we have suctioning available to us and we suction the person to the best of our ability. And once we know where the landmarks are, where the vocal cords are, we place the tube in there. And then we know if we are seeing that much of a vomitus in the throat area, in the back of the tongue area, all of that area, then we are going to see a lot more which has gone in the lung and that needs to be aspirated right away. So once we put the tube in, our respiratory therapist already know, they start aggressively suctioning that material which has gone into the lung. And that's how not only we are able to push air, air can go to the – to the lung to oxygenate them.

{¶ 112} Dr. Ahmed was asked whether he had reviewed the medical records in the case. He said that he had and that he had continued to think about what happened here that led to the findings on autopsy, so he asked his attorney for the EMS report. Regarding that report, Dr. Ahmed told the jury that the EMTs "described the whole

36.

scene" and "exactly what happened at that time." He said that the "nurses [were] present at the bedside suctioning patient." The EMTs were "not able to do the airway which I do," so they "put their own airway . . . through patient's mouth," "they ke[pt] on suctioning," "they did it multiple times," and "they report[ed] vomitus and bile from the lungs." Dr. Ahmed told the jury that because these interventions were undertaken by the EMTs who tried to resuscitate Joel, he was left with "no doubt about what exactly caused the whole process here." He said that this explained why, on autopsy, there was no vomitus found in the airway—this was "the whole reason why in the autopsy they were not able to see anything in that trachea or bronchial tube because when they put the airway in, very first thing we do is we suctioning with a catheter."

{¶ 113} Similarly, Dr. Khan explained to the jury:

> [The EMTs] would do chest compressions that will blow out some stuff from the lung. And they will put the endotracheal tube in, which we do normally in the ICU, and they will suction it. That's the first thing they do because there was also saying from EMT that there was gurgling sounds like the nurse described and that would be cleared up. They have to clear that up to be able to ventilate him with a bag.

Dr. Khan told the jury that there were no secretions in Joel's lungs at autopsy because "we had endotracheal tube and suctioning. And big, bulky guys with life support team, EMT, they came in and did the CPR, so they also brought up all the secretions from the lung and that's why there were not seen secretions in the lung. But there's no question."

{¶ 114} Plaintiffs did not object *during* the doctors' testimony—they lodged the above-described objections before the doctors testified—however, they now argue on appeal that the doctors should not have been permitted to testify about the contents of the

37.

EMS report because (1) the report was not properly disclosed, introduced, or admitted during trial and its introduction on the morning of trial constituted unfair surprise; (2) the doctors lacked personal knowledge about the contents of the report; (3) the testimony constituted hearsay (and hearsay within hearsay) to which no exception applies; (4) the doctors used the facts perceived by the EMTs as the basis for "lay opinions" and "blurred [the] lines from their professional, lay opinions, and a relaying of the events of the EMS response"; and (5) the probative value of the testimony was outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.

{¶ 115} The physicians argue that (1) plaintiffs waived or forfeited error here because they made a single objection that encompassed only the admission of the EMS report and not the doctors' testimony; (2) plaintiffs failed to cite hearsay as the basis for their objection; (3) the testimony was merely cumulative of other evidence; (4) there was no unfair surprise or undue delay, and the jury was not misled or confused; (5) the jury never reached the issue of causation; and (6) Drs. Ahmed and Khan are board-certified physicians who treated Joel, were disclosed as expert witnesses, and had sufficient expertise and training to permit them to testify about resuscitating and intubating patients. They also deny that Dr. Khan testified about the EMS report—they claim he testified primarily about his experience resuscitating aspirated patients, generally.

### 1. Preservation of Error

{¶ 116} The first issue we must resolve is whether the plaintiffs properly preserved their objection to the doctors' testimony. Under Evid.R. 103(A)(1), "[e]rror may not be predicated upon a ruling which admits . . . evidence unless a substantial right

38.

of the party is affected; and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context." The failure to object to trial testimony or specify the basis for an objection waives all but plain error. *State v. Hartman*, 93 Ohio St.3d 274, 281 (2001); *see City of Beachwood v. Brown*, 1997 WL 547964, *2 (8th Dist. Sept. 4, 1997).

{¶ 117} Here it is clear that plaintiffs objected to the admission of the EMS report—the parties agree on this point. But they disagree (1) whether plaintiffs objected to the doctors' *testimony* about the report, (2) whether plaintiffs' single objection registered before the doctors testified was sufficient to preserve the error for review on appeal, and (3) whether plaintiffs preserved their hearsay objection given that they did not cite "hearsay" as a basis for their objection.

### a. Objection to Testimony

{¶ 118} The record suggests that just before Dr. Ahmed was called to testify, counsel for Drs. Ahmed and Khan alerted plaintiffs' counsel that she intended to utilize the EMS report in her direct examination of her clients. When defense counsel called Dr. Ahmed to the stand, plaintiffs' counsel asked to approach the bench. We described above the specific objections counsel offered during that bench conference. The doctors deny that those objections encompassed the doctors' *testimony*—they contend that they encompassed only the report itself.

{¶ 119} During the bench conference, the court stated that it didn't know if the report would be admitted into evidence given plaintiffs' representation that it wasn't disclosed in the defendants' exhibit list, "[b]ut if [defense counsel] is going to question

[the doctors] about it, that's different." Plaintiffs' counsel responded that "if the jury hears the contents of that document the prejudicial value is established regardless of whether it's admitted and goes back with them." She referenced the difficulty she would have examining the doctors concerning "the contents" of the report and the prejudice that would result from "even just the discussion of its contents." We find that this objection was sufficient to encompass not only the admission of the report, but also testimony concerning the contents of the report.

### b. Single Objection

{¶ 120} Plaintiffs made a single objection *before* the doctors testified. The doctors argue that this was not sufficient to preserve error, particularly with respect to the doctors' general testimony about the procedure for running a code on a patient who has aspirated. Plaintiffs respond that it is unnecessary to renew an objection once the court has made a definitive ruling.

{¶ 121} To address the sufficiency of plaintiffs' single objection, we need to briefly examine their arguments in support of the assigned error. Plaintiffs argue that the defendant doctors lacked personal knowledge of what was described in the EMS report. They claim that the doctors could not provide general testimony about resuscitation because they did not attempt to resuscitate Joel and did not supply expert reports. They claim that Drs. Ahmed and Khan's testimony was the only source of information suggesting that resuscitation efforts—and the suctioning of Joel's airway—was the reason that a volume of vomit consistent with massive aspiration was not found at autopsy. They claim that when testifying about the contents of the EMS report, the

40.

doctors "wove those contents in with testimony of their personal experiences with patients requiring CPR and suctioning, along with quasi-hypotheticals from their counsel," and "blurred [the] lines from their professional, lay opinions, and a relaying of the events of the EMS response," thereby misleading and causing confusion for the jurors. And they claim that the doctors embellished to add self-serving details not reflected in the four corners of the EMS report.

{¶ 122} The failure to object to a witness' qualifications or purported foundational deficiencies generally forfeits any challenge on appeal. *Michigan Millers Mut. Ins. Co. v. Christian,* 2003-Ohio-2455, ¶ 32 (3d Dist.). That is because such deficiencies could have been resolved at trial had they specifically been brought to the trial court's attention. *See Hammond v. Nichols,* 2003-Ohio-6463, ¶ 5 (4th Dist.).

{¶ 123} Plaintiffs' arguments illustrate why a single objection did not suffice here. For instance, specific objections would have allowed the court to differentiate between aspects of the doctors' testimony of which they had personal knowledge (e.g., resuscitation in general) versus aspects of which they did not have personal knowledge (e.g., the specific efforts to resuscitate Joel); determine whether the contents of the report were improperly embellished; rule on the appropriateness of asking the defendant-pulmonologists "quasi-hypotheticals"; consider whether a proper foundation was laid before the doctors testified that suctioning during resuscitation expelled large enough quantities of vomit to explain their massive-aspiration theory; and prevent the doctors from repeating statements summarized in the report. When the substance of plaintiffs' arguments is considered, it is clear that specific objections registered at the time of the

41.

testimony could have allowed the court to resolve claimed deficiencies if brought to its attention. This is not a situation where it was appropriate for plaintiffs to rely on a single objection entered before the witnesses testified. Objections to specific questions or responses should have been registered while the doctors were testifying.

### c. Basis for Objection

{¶ 124} Where hearsay claims are not preserved by objection at trial, they are waived, absent plain error. *State v. Keenan,* 81 Ohio St.3d 133, 142 (1998). Plaintiffs did not specifically cite "hearsay" as the basis of their objection to the doctors' testimony, however, they maintain that the specific ground for an objection need not be articulated where it is apparent from the context. They argue that the objections they articulated sufficiently conveyed that hearsay was one of the bases for their objection.

{¶ 125} The Ohio Supreme Court addressed a similar issue in *Plain Local Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision,* 2011-Ohio-3362, ¶ 18-20. In that case, the school board challenged a decision of the Board of Tax Appeals. The BTA had affirmed the decision of the Franklin County Board of Revision, which had determined that the true value of an office building owned by a bank was substantially less than the originally-appraised value. On appeal, the school board argued, inter alia, that the BOR and BTA erred by determining the value of real property based on factual material contained in a written appraisal report, where the appraiser who prepared the report did not testify.

{¶ 126} At the BOR hearing, an appraiser ("the testifying appraiser") testified that she reviewed an appraisal report prepared by another appraiser ("the non-testifying

42.

appraiser") who inspected the property. She said that the report was consistent with her own inspection and analysis. Counsel for the school board asked no questions of the testifying appraiser, but he objected to the admission of the appraisal report because (1) it did not offer an opinion of the value of the building as of the tax-lien date, and (2) it was not prepared for ad valorem taxation purposes. He did not object on the basis that the information contained in the appraisal report constituted hearsay. The BOR reached a decision unfavorable to the school board and relied on the report's valuation in doing so.

{¶ 127} The school board appealed to the BTA, waived a hearing, but renewed its objections in its brief. It argued that the appraisal report was inadmissible because it did not offer an opinion of value as of the tax-lien date and asserted that the testifying appraiser's testimony was not sufficient evidence of value because she did not perform an appraisal herself. Again, the school board did not assert that the information contained in the appraisal report was inadmissible on hearsay grounds. The BTA affirmed, determining that the testifying appraiser provided her opinion of the property's worth on the tax lien date and supported that opinion with evidence from the non-testifying appraiser's written report. It noted that it could not rely on the non-testifying appraiser's ultimate opinion of value, but it explained that it had considered the information contained in that report together with the testifying appraiser's testimony.

{¶ 128} On appeal to the Ohio Supreme Court, the school board again argued that the appraisal report did not constitute evidence of the value of the property on the tax-lien date. And for the first time, it raised a hearsay objection to the contents of the appraisal report. It argued that the appraisal report was itself inadmissible because its preparer did

43.

not testify, therefore, the testifying appraiser's opinion of value was unsupported and did not provide reliable and probative evidence of value. The bank pointed out that the school board did not object to the testifying appraiser's testimony or the factual information contained in the appraisal.

{¶ 129} The Ohio Supreme Court agreed that the school board did not object to the report on hearsay grounds, nor did it object on the grounds that the testifying appraiser lacked personal knowledge of the matters contained in the appraisal report. The Court explained that "when it comes to the admissibility of evidence, the general rule is that '[h]earsay challenges are waived, absent plain error, if not objected to during the subject proceedings.'" (Citations omitted.) *Id.* at ¶ 21. It found the failure to object on hearsay grounds fatal to the school board's appeal. It further concluded that consideration of the appraisal report did not constitute plain error because the record contained indicia of reliability for the contents of the report—i.e., it was prepared by a certified appraiser for a specific business purpose of the bank and was used for that business purpose, and its contents were certified by the non-testifying appraiser who prepared the report.

{¶ 130} Similarly, in *Morris v. McQuillen*, 2009-Ohio-2848 (5th Dist.), respondent appealed the entry of a civil protection order against him. At the full hearing on the petition, the appellee attempted to read from a police report. Respondent's counsel objected on the ground that she had no personal knowledge of its contents, and the court did not permit her to read from the report, nor did it admit the report into evidence. Nevertheless, without further objection, the petitioner testified at length regarding

44.

statements contained in the police report and respondent cross-examined her regarding the statements and incidents to which she testified on direct.

{¶ 131} On appeal, respondent argued that the court's findings were based on inadmissible hearsay. The appellate court observed that "[i]t is well-settled that a party must object in order to preserve an issue for appeal." *Id.* at ¶ 14. And because the respondent failed to object to the testimony during the hearing, the court reviewed the trial court decision for plain error. It found no plain error because while respondent specifically objected to the police reports, he failed to object to the balance of petitioner's testimony and cross-examined her about it. *See also Amerifirst Savings Bank of Xenia v. Krug,* 136 Ohio App.3d 468, 481-82 (2d Dist.1999) (finding that it was unclear that hearsay was the basis of appellant's objection to witness's testimony concerning the authentication of documents).

{¶ 132} "Failure to either object or move to strike evidence at trial on the basis of hearsay, a witness' qualifications, or purported foundational deficiencies, waives any challenge on appeal, save plain error." (Citations omitted.) *Michigan Millers Mut. Ins. Co.,* 2003-Ohio-2455, at ¶ 32 (3d Dist.). Because plaintiffs failed to object on the basis of hearsay, we conclude that they have forfeited their challenge on appeal unless we find plain error.

### 3. *Plain Error*

{¶ 133} Because we have found that plaintiffs' single objection to the challenged testimony was not sufficient, and because we have found that plaintiffs failed to object to the testimony on the basis of hearsay, we are limited to a plain-error review. In appeals

45.

of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus. "To constitute plain error in a civil case, the error must be 'obvious and prejudicial' and 'if permitted, would have a material adverse effect on the character and public confidence in judicial proceedings.'" *Kebe v. Bush*, 2019-Ohio-4976, ¶ 23 (8th Dist.), quoting *Friedland v. Djukic*, 2010-Ohio-5777, ¶ 37 (8th Dist.). Here, we do not find that this is the extremely rare case involving exceptional circumstances justifying reversal under the plain-error doctrine.

{¶ 134} First, this document was available—and its contents should have been familiar—to all parties. The EMS report documents the last medical interventions attempted with respect to this patient. That it was never provided to any expert witness and had never been the subject of interest or inquiry until the final two witnesses' trial testimony is, frankly, unusual. In fact, it is unusual that first responders and Ann Grady personnel who were present that night were not deposed and did not testify at trial. We cannot say that the basic fairness of the judicial process itself was seriously affected by allowing the doctors to testify about a report that was equally available, and should have been familiar, to both parties.

{¶ 135} Second, like the appraisal report in *Plain Local Schools Bd. of Edn.*, 2011-Ohio-3362, the EMS report contains indicia of reliability. Although not authenticated,

46.

the EMS report shares much of the same indicia of reliability as the medical records the witnesses relied on at trial.

{¶ 136} Third, the EMS report was not the only source of some of the information referenced in the pulmonologists' testimony. For instance, the Ann Grady notes make clear that Joel made gurgling sounds, nurses prepared to suction his airway, and EMS attended to him for approximately 30 minutes. Additionally, the autopsy report indicates that an endotracheal tube was placed during resuscitation efforts, evidencing that attempts were made to clear Joel's airway. We cannot say that the basic fairness of the judicial process was seriously affected given that the challenged document was not the only source of the pulmonologists' testimony.

{¶ 137} Finally, the absence of the entire trial transcript prevents us from finding reversible error here. That is, portions of the trial testimony were not ordered to be transcribed and were not filed with this court. Appellants have a duty to provide a transcript of all parts of the trial court proceedings pertinent to their appeal. App.R. 9(B). Under Civ.R. 61, "[n]o error in either the admission or the exclusion of evidence . . . is ground for . . . vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." "To find that substantial justice has not been done, a court must find (1) errors and (2) that without those errors, the jury probably would not have arrived at the same verdict." *Hayward v. Summa Health Sys./Akron City Hosp.,* 2014-Ohio-1913, ¶ 25, citing *Hallworth v. Republic Steel Corp.,* 153 Ohio St. 349 (1950), paragraph three of the syllabus. Regardless of whether we review for plain error or otherwise, plaintiffs'

47.

assignments of error require us to review the entire record in considering whether prejudicial error occurred. *See Kirn v. Toth Buick-Opel*, 1981 WL 3994, *2 (9th Dist. May 27, 1981), citing Civ.R. 61 (observing that "where it appears from the entire record that substantial justice was accomplished," a judgment will not be reversed on the basis that evidence was improperly excluded or disregarded); *Lourdes K. v. Gregory Q.,* 1997 WL 256681, *6 (6th Dist. May 16, 1997) (reviewing entire record and determining that error in admission of hearsay evidence was harmless).

{¶ 138} In sum, this is not the extremely rare case involving exceptional circumstances justifying reversal under the plain-error doctrine. We find no plain error in the trial court's decision permitting Drs. Ahmed and Khan to testify about the contents of the EMS report, which describe the last medical interventions pertinent to Joel's care. Accordingly, we find plaintiffs' first assignment of error not well-taken.

## B. Stipulation

{¶ 139} Before trial, plaintiffs and Dr. Crayne entered into the following stipulation:

> Plaintiffs and Defendant John A. Crayne, M.D. stipulate that Defendant John A. Crayne, M.D.'s documentation in the medical records, including, but not limited to, any alleged inaccuracies in his documentation, do not constitute a departure from accepted standards of medical care. Plaintiffs and Defendant further stipulate that the documentation of Defendant John A. Crayne, M.D. was not a proximate cause of Plaintiffs' decedent's injuries and death as alleged in Plaintiff's Complaint.

> Accordingly, Plaintiffs will not assert that Defendant Crayne's documentation in the medical record constitutes a departure from the accepted standards of medical care or was the proximate cause of Plaintiffs' decedent's injuries and death. The stipulation neither precludes Plaintiffs from describing, introducing, or otherwise addressing Defendant Crayne's

48.

documentation in the medical record for other purposes nor precludes Defendant John A. Crayne, M.D. from opposing such use by Plaintiffs either by motion practice or at the time of trial.

{¶ 140} Citing this stipulation, Dr. Crayne filed a pretrial motion in limine asking the court to prohibit any witnesses from testifying to errors or discrepancies in Dr. Crayne's documentation in the medical record. The trial court granted this motion. Plaintiffs argue that this was error requiring reversal.

{¶ 141} In his motion in limine, Dr. Crayne argued that when plaintiffs' counsel deposed Dr. Moss, she questioned him about discrepancies in—and the reliability or accuracy of—Dr. Crayne's charting. This questioning culminated in her asking: "Do the discrepancies noted in the records here cause you any concern as to the degree of diligence that Dr. Crayne utilized while caring for Mr. Pasienza?" Dr. Crayne argued that these questions demonstrated that plaintiffs intended to argue that alleged errors in Dr. Crayne's documentation called into question other aspects of his care of the patient. He maintained that this ran afoul of the stipulation. He also claimed that questions about discrepancies or errors in Dr. Crayne's charting were not relevant, violated Evid.R. 404(B)(1), and were unfairly prejudicial.

{¶ 142} Plaintiffs responded that Dr. Crayne's interpretation of the stipulation was overly broad and inconsistent with its terms. They insisted that the stipulation prohibited them from asserting that Dr. Crayne's documentation violated the standard of care or proximately caused Joel's injuries and death, but did *not* prevent them from "describing, introducing, or otherwise addressing" the documentation for other purposes. They claimed that the documentation is important evidence of the medical care Joel received

49.

and was relied upon by the expert witnesses as factual evidence. As such, they argued that it was fair for plaintiffs to inquire about the reliability of those records and the extent to which experts or other defendants relied on the documentation. They disputed the applicability of Evid.R. 404(B)(1), and insisted that the probative value of the evidence outweighed any danger of unfair prejudice.

{¶ 143} The trial court granted Dr. Crayne's motion. It held that the witnesses were prohibited from testifying as to any errors or discrepancies in Dr. Crayne's documentation in the medical record.

{¶ 144} Plaintiffs argue that the trial court erred in granting Dr. Crayne's motion because (1) the plain language of the stipulation allowed for other types of testimony regarding Dr. Crayne's medical documentation; (2) discrepancies in Dr. Crayne's medical documentation raised questions about Joel's true physical condition during the relevant time period; and (3) the extent to which experts relied on records with errors and discrepancies is highly probative of their credibility.

{¶ 145} Dr. Crayne responds that plaintiffs failed to proffer evidence to enable the trial court to make a final determination as to its admissibility and to preserve the objection for appeal. He also reiterates that the stipulation rendered testimony about documentation discrepancies not relevant; plaintiffs sought to disparage Dr. Crayne's character by arguing that his allegedly poor charting practices provide insight into the care provided to his patients; all the experts reviewed and relied on the same records in rendering opinions, therefore, if the defense experts were less credible because they reviewed and relied on the documentation, so were plaintiffs' experts; and plaintiffs' only

50.

purpose for highlighting documentation deficiencies was to inflame the jury and allow them to assume that Dr. Crayne was a sloppy physician.

{¶ 146} Plaintiffs reply that the trial court's ruling was definitive, thus they were not required to renew their objection, and they preserved the issue on appeal by raising it during Dr. Alhabbal's testimony. They disagree that evidence of Dr. Crayne's documentation was "other acts" or other improper character evidence.

{¶ 147} "[T]he admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 2006-Ohio-2815, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An unreasonable decision is one that lacks sound reasoning to support the decision. *Hageman v. Bryan City Schools*, 2019-Ohio-223, ¶ 13 (10th Dist.). "An arbitrary decision is one that lacks adequate determining principle and is not governed by any fixed rules or standard." *Id.*, quoting *Porter, Wright, Morris & Arthur, LLP v. Frutta del Mondo, Ltd.*, 2008-Ohio-3567, ¶ 11 (10th Dist.). And an unconscionable decision is one "that affronts the sense of justice, decency, or reasonableness." *Id.*

{¶ 148} The stipulation permits plaintiffs to "describe[e], introduce[e], or otherwise address[] Defendant Crayne's documentation in the medical record" for purposes other than arguing that inaccuracies or errors in the documentation were a departure from the accepted standard of care that proximately caused Joel's injuries and

51.

death.  The trial court held that the witnesses could not testify about errors or discrepancies in Dr. Crayne's documentation.

{¶ 149} We begin by briefly addressing the issue of whether plaintiffs properly preserved error here.  Plaintiffs correctly point out that "[o]nce the court rules definitely on the record," Evid.R. 103 no longer requires a party to renew an objection or offer of proof to preserve a claim of error for appeal.  While this is true—and while the trial court did rule definitely—the problem here is that without knowing specifically what evidence plaintiffs claim they were prevented from introducing, we are left to speculate.  We decline to do that and will address plaintiffs' arguments in the context of the single example described in their briefs:  "discrepancies between Dr. Crayne's documentation as to his assessment of the patient's lungs as compared to the documentation of the pulmonologist's assessment of the patient's lung."

### 1.  Plain Language of the Stipulation

{¶ 150} Concerning plaintiffs' more general claim that the trial court misapplied the plain language of the stipulation, we find that it did not.  Criticism that Dr. Crayne's charting contained errors, discrepancies, or inaccuracies is just another way of asserting that his charting was negligent—exactly what the stipulation prohibited.  The court's ruling was not inconsistent with the stipulation.

### 2.  Joel's True Condition

{¶ 151} Concerning plaintiffs' claim that discrepancies in Dr. Crayne's medical documentation "raise[d] questions about Joel's true physical condition during the relevant time period," the court's pretrial ruling did not prevent plaintiffs from questioning

52.

witnesses on this topic. In the one example plaintiffs identify, they claim that they were prevented from exploring "discrepancies between Dr. Crayne's documentation as to his assessment of the patient's lungs as compared to the documentation of the pulmonologist's assessment of the patient's lung."

{¶ 152} First, we note that at Dr. Armitage's *trial* deposition—taken before the order on the motion in limine—plaintiffs questioned him about this discrepancy. As far as this court can tell, the jury heard the entirety of Dr. Armitage's trial deposition. As such, this "discrepancy" was highlighted for the jury.

{¶ 153} Second, this is a poor example of an "error or discrepancy" in Dr. Crayne's charting given that there was no evidence presented that this did not accurately reflect Dr. Crayne's observations. Rather, it suggests either that rhonchi were present when the pulmonologists examined Joel but were not present when Dr. Crayne examined him *or* that rhonchi were present when Dr. Crayne examined Joel but he failed to appreciate this when auscultating Joel's chest. In either of these scenarios, the alleged error or discrepancy lay in the examination findings—not the charting itself—and the court's order did not prevent plaintiffs from exploring this topic.

{¶ 154} Third, if plaintiffs truly believed that Dr. Crayne did not accurately chart his findings and intended to emphasize this to the jury, they should not have entered into the stipulation agreeing that alleged inaccuracies in his documentation did not violate the standard of care. Characterizing the *charting* as inaccurate is exactly what plaintiffs agreed not to do.

53.

{¶ 155} In sum, the court's ruling did not prevent plaintiffs from exploring Joel's "true physical condition." They were simply prevented from claiming that Dr. Crayne inaccurately charted his findings, which is a distinction with a difference.

### 3. Credibility of the Experts

{¶ 156} Finally, concerning their claim that the experts' reliance on records with errors or discrepancies is probative of their credibility, plaintiffs claim that "a medical expert's willingness to rely on incorrect or inconsistent records can provide information to the jury about that expert's credibility." As an initial matter, as Dr. Crayne points out, the experts all received—and therefore relied on—the same medical records. And in any event, plaintiffs fail to identify in what manner the records were "incorrect or inconsistent." The example they provide suggests that the doctors' examination findings differed—not that the charting itself was inaccurate. To that end, it was possible to test the expert witnesses by posing hypotheticals, asking them to assume that Dr. Crayne was correct that Joel's chest was clear, or asking them to assume that Dr. Crayne was incorrect that Joel's chest was clear. Plaintiffs were not prevented from exploring the topic—they were prevented from doing so in a manner that implied to the jury that Dr. Crayne made errors in his *charting* rather than in his *examination*.

{¶ 157} We conclude that the trial court's ruling on Dr. Crayne's motion in limine did not misapply the parties' stipulation. We find plaintiffs' second assignment of error not well-taken.

54.

### C.  Cumulative Error

{¶ 158} In their third assignment of error, plaintiffs argue that the cumulative effect of the following errors requires reversal:  (1) allowing Dr. Kaul, an infectious disease specialist, to render pulmonology and family-care standard of care opinions; (2) permitting the mischaracterization of Dr. Felo's testimony; (3) excluding demonstrative evidence during Dr. Alhabbal's testimony; (4) excluding evidence of who "owned" Joel's care while he was hospitalized; and (5) incorrectly sustaining objections on the basis that they were leading.

{¶ 159} Under the doctrine of cumulative error, a judgment may be reversed when the cumulative effect of errors deprives a defendant of his or her constitutional rights, even though such errors are not prejudicial singly.  *State v. Williams*, 2002-Ohio-4831, ¶ 36 (6th Dist.), citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197 (1987).  For the cumulative error doctrine to apply, there must first be a finding that multiple errors were committed at trial.  *State v. Moore*, 2019-Ohio-3705, ¶ 87 (6th Dist.), citing *State v. Madrigal*, 87 Ohio St.3d 378, 397 (2000).

### 1.  Dr. Kaul

{¶ 160} First, plaintiffs argue that Dr. Kaul should not have been permitted to provide standard of care opinions for pulmonologists or a family physician because he is an infectious disease specialist and is not qualified to do so.  They maintain that although other experts had supplied the same opinions, this created "an extreme imbalance" in the number of doctors telling the jury that Drs. Crayne, Ahmed, and Khan did not violate the standard of care.

55.

{¶ 161} The pulmonologists respond that Dr. Kaul's specialty overlaps with pulmonology, therefore, Dr. Kaul was properly permitted to provide standard of care opinions. Similarly, Dr. Crayne responds that Dr. Kaul testified about an aspect of medicine that is cross-disciplinary—hospital discharge. As such, he claims, Dr. Crayne was permitted to testify as to the standard of care in the discharging process. Additionally, Dr. Crayne argues that under Evid.R. 601(B)(5)(c), an expert in one medical specialty may not testify *against* a health care provider in another medical specialty unless the expert shows both that the standards of care and practice in the two specialties are similar and that the expert has substantial familiarity between the specialties." (Emphasis added.) Because Dr. Kaul did not testify *against* the physicians here, Dr. Crayne maintains that Evid.R. 601 does not apply.

{¶ 162} Evid.R. 601(B)(5)(c) provides:

> A person giving expert testimony on the issue of liability in any medical claim . . . against a physician . . . arising out of the diagnosis, care, or treatment of any person by a physician . . . unless . . . [t]he person practices in the same or a substantially similar specialty as the defendant. The court shall not permit an expert in one medical specialty to testify against a health care provider in another medical specialty unless the expert shows both that the standards of care and practice in the two specialties are similar and that the expert has substantial familiarity between the specialties.

Regardless of whether there is any merit to Dr. Crayne's position that Evid.R. 601(B)(5)(c) is inapplicable to defense experts, the trial evidence demonstrates that the standards of care and practice as between infectious disease and pulmonology specialists are similar respecting the diagnosis and treatment of pneumonia. Both infectious disease and pulmonology specialists diagnose and treat pneumonia, and both are knowledgeable

56.

about the risks and benefits of prescribing antibiotics to treat respiratory infections. Dr. Kaul specifically testified that the scope of his practice overlaps with pulmonology. Given that both infectious disease and pulmonology specialists are consulted and treat patients with respiratory infections, including pneumonia, under the circumstances of this case, we find that Dr. Kaul was qualified to provide opinions with respect to Drs. Ahmed and Khan's treatment of Joel. *See Alexander v. Mt. Carmel Med. Ctr.,* 56 Ohio St.2d 155, 158 (1978) ("Where, as here, the fields of medicine overlap and more than one type of specialist may perform the treatment, a witness may qualify as an expert even though he does not practice the same specialty as the defendant.").

{¶ 163} As for whether Dr. Kaul was qualified to render opinions pertinent to the standard of care applicable to Dr. Crayne, a family physician, Dr. Kaul testified simply that it was appropriate for Dr. Crayne to discharge Joel without further investigation. He had already explained that Joel's clinical course was not consistent with pneumonia, antibiotics should not have been prescribed empirically, and no further investigation needed to be performed before discharging Joel. Although Dr. Kaul does not practice as a family physician or hospitalist, given his expertise in infectious diseases, it does not strike us as an abuse of discretion to allow him to testify that Dr. Crayne acted reasonably in discharging Joel without further investigation when Dr. Kaul himself—more specially trained in the field—found no evidence consistent with an infectious process. Had Dr. Kaul testified conversely—i.e., that Dr. Crayne, a physician with less particularized training, violated the standard of care by discharging Joel—it may have been problematic because the effect would be to hold Dr. Crayne to a higher standard of care than would

57.

reasonably be expected of a hospitalist or family physician. But given that Dr. Kaul opined that Dr. Crayne satisfied the standard of care despite having less specialized knowledge, it is less problematic. We find no abuse of discretion in the trial court's decision allowing him to render a standard of care opinion concerning the reasonableness of Dr. Crayne's discharge of Joel.

{¶ 164} As for tallying up the number of expert witnesses, we do not find that it is appropriate to "keep score" in this manner. And even if we did, we conclude that allowing the hospitalist and pulmonologists to call two experts each was not an abuse of discretion.

### 2. Dr. Felo

{¶ 165} Second, plaintiffs argue that the doctors were permitted to twist Dr. Felo's testimony to state "there is nothing in the autopsy report consistent with [Joel] having pneumonia on 8/25," when in fact he testified that Joel developed pneumonia before his discharge, but was not permitted to explain that a lack of advanced pneumonia in autopsy slides from an unknown part of the lung is not evidence that he did not have pneumonia dating back to August 25, 2017.

{¶ 166} All the doctors deny that Dr. Felo's testimony was mischaracterized— they insist that Dr. Felo testified that he could not date the pneumonia back to August 25, 2017. Dr. Crayne argues that plaintiffs' counsel's concern here—that Dr. Felo was not permitted to explain that just because the slides he viewed did not show evidence of advanced pneumonia does not mean that slides from another part of the lung would not

58.

have shown a more advanced pneumonia dating back to August 25, 2017—was cured on redirect, so plaintiffs cannot now ignore the cure and claim error.

{¶ 167} We do not find that the defendant doctors misrepresented Dr. Felo's testimony. Dr. Felo, in fact, testified that the slides that were available to him—samples from an unknown part of the lung—were not consistent with pneumonia that had been present since August 25, 2017. Although plaintiffs make the point that slides from another part of the lung may have shown a more advanced pneumonia, the fact remains that the evidence available to Dr. Felo from the autopsy was not consistent with pneumonia that began on August 25, 2017. Dr. Felo responded affirmatively when defense counsel asked him whether it was true that pneumonia present on August 25, 2017 would be inconsistent with anything sampled for the autopsy. We do not believe that the defendant doctors misstated the evidence, thus there was no error in this regard.

### 3. Demonstrative Evidence

{¶ 168} Third, plaintiffs argue that upon objection from Dr. Crayne's counsel, they were precluded from using a demonstrative exhibit that would have helped Dr. Alhabbal more easily summarize Joel's vital signs by displaying exclamation marks to indicate abnormalities.

{¶ 169} Dr. Crayne maintains that his objection rested on plaintiffs' failure to explain and lay a foundation for the exclamation marks, and he insists that he simply requested that the exclamation marks be taken down "until there's a reason to put them up." He explains that plaintiffs' counsel removed the exclamation marks and used the remainder of the demonstrative exhibit.

59.

{¶ 170} The demonstrative exhibit is not contained in the record. Without being able to review that exhibit, we cannot say that it was error for the trial court to sustain an objection to its contents.

### 4. *"Owning" Joel's Care*

{¶ 171} Fourth, plaintiffs argue that the trial court erred in sustaining an objection to their expert witness testifying that as a hospitalist, he would "own" the care of the patient, which he explained meant that he was responsible for knowing all the details about the patient's care, reviewing labs and x-ray results, and making sure that he is on common ground with consultants. Plaintiffs clarify that "owning" meant that the hospitalist owed a duty to the patient—an essential element of their negligence claim. Plaintiffs maintain that when the court sustained this objection, it prevented them from meeting their burden of proof as to the elements of negligence. Dr. Crayne argues that the jury was left to speculate to what ownership entailed, and insists that plaintiffs' counsel could have simply rephrased her question, but did not.

{¶ 172} We agree with Dr. Crayne. When the trial court sustained Dr. Crayne's objection to Dr. Alhabbal's use of the phrase "owning the patient," it was incumbent on plaintiffs to rephrase their questions to elicit testimony in terms more typically used in the context of medical negligence claims—that the physician owed a duty to the patient. It was not error to require plaintiffs to do so.

### 5. *Leading Questions*

{¶ 173} Finally, plaintiffs argue that the trial court erred by incorrectly sustaining objections to questions that defense counsel argued were leading. They cite three

60.

examples: (1) "Is pneumonitis something that has to be treated?"; (2) "[C]an you describe any effect that having consulted with pulmonologists on day one that Dr. Crayne would have in your opinion that he deviated from the standard of care as to the discharge on September 5th?"; and (3) "[I]n examining the contacts for patient, what would be the justification for limiting the review of the patient's information to signs and symptoms only?". Plaintiffs maintain that these rulings interrupted their presentation of evidence and created the false impression that plaintiffs were attempting to circumvent proper procedure.

{¶ 174} Dr. Crayne responds that the objections were not clearly erroneous and, at worst, they were close calls. He criticizes the first question as suggesting a response of "yes," which he claims renders it leading. He points out that plaintiffs' counsel rephrased the question and elicited a more nuanced answer. He criticizes the second question as confusing, but nevertheless maintains that it was a leading question because it suggested the response. And he insists that the third question was leading, and plaintiffs' counsel rephrased the question and elicited the response she was looking for.

{¶ 175} "A leading question is 'one that suggests to the witness the answer desired by the examiner.'" *State v. Diar*, 2008-Ohio-6266, ¶ 149, quoting 1 McCormick, Evidence (5th Ed.1999) 19, Section 6. "Under Evid.R. 611(C), '[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness's testimony.'" *Id.*

{¶ 176} We agree with Dr. Crayne that these examples present close calls as to whether or not they are leading. To that end, we cannot say that the court's rulings on the

61.

objections were unreasonable, arbitrary, or unconscionable.  In any event, with respect to the first and third examples, plaintiffs' counsel restated her questions, asked better, clearer questions, and elicited the responses she was seeking.  We agree that even if not leading, the second question was confusing as worded.  And while the objections and rulings may have momentarily interrupted the presentation of evidence, we disagree with plaintiffs that the objections and rulings created the false impression that plaintiffs were attempting to circumvent proper procedure.

{¶ 177} In sum, we conclude that these various evidentiary rulings did not produce cumulative error requiring reversal.  We find plaintiffs' third assignment of error not well-taken.

### D.  Dr. Crayne's Cross-Appeal

{¶ 178} Our resolution of plaintiffs' assignments of error renders Dr. Crayne's cross-appeal moot.

### III.  Conclusion

{¶ 179} Plaintiffs failed to properly preserve error with respect to their objections to Drs. Ahmed and Khan's testimony about the contents of the EMS report.  Having reviewed their challenge under a plain-error standard of review, we find no plain error. Plaintiffs' first assignment of error is not well-taken.

{¶ 180} The trial court did not misapply the parties' stipulation in prohibiting plaintiffs from eliciting testimony as to errors or discrepancies in Dr. Crayne's charting. The court's ruling was not inconsistent with the plain language of the stipulation, did not prevent plaintiffs from exploring Joel's "true physical condition," and did not prevent

62.

plaintiffs from challenging the experts' credibility. Plaintiffs' second assignment of error is not well-taken.

{¶ 181} The trial court's evidentiary rulings did not produce cumulative error requiring reversal. Plaintiffs' third assignment of error is not well-taken.

{¶ 182} We dismiss as moot Dr. Crayne's cross-appeal.

{¶ 183} We affirm the July 25, 2023 judgment of the Lucas County Court of Common Pleas. Plaintiffs are ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.            _____
                                                    JUDGE

Christine E. Mayle, J.                 _____

Gene A. Zmuda, J.                                JUDGE
CONCUR.

                                             _____
                                                   JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.