[Cite as *Glase v. Joshi*, 2025-Ohio-4438.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Jeffrey Glase

    Appellant

v.

Mandar M. Joshi, M.D.

    Appellee

Court of Appeals No. L-24-1151

Trial Court No. CI0202301552

**DECISION AND JUDGMENT**

Decided: September 23, 2025

* * * * *

Anthony J. Richardson, II, and Anthony J. Glase, for appellant.

Brian D. Sullivan, Robert D. Wagner, and Brianna M. Prislipsky,
for appellee.

* * * * *

**SULEK, P.J.**

{¶ 1} In this medical malpractice action, appellant, Jeffrey Glase, appeals a judgment of the Lucas County Court of Common Pleas awarding summary judgment in favor of appellee, Mandar M. Joshi, M.D. Because the trial court erred by excluding Glase's expert's opinion and the judgment fails to address the admissibility of the expert's post-deposition affidavit and report, the judgment is reversed.

## I. Facts and Procedural History

{¶ 2} The underlying facts are undisputed. On December 2, 2020, Glase complained to his treating ophthalmologist of vision changes in his left eye which were also observed while using the Amsler grid.[1] The next day, Glase had his initial appointment at Retina Vitreous Associates (RVA) for an age-related macular degeneration (AMD) evaluation with Dr. Joshi, an ophthalmologist-trained retinal specialist. Glase complained of worsening, decreased vision in his eye describing it as a dark spot in his vision. The evaluation consisted of vision testing, pressure testing, anterior segment examination, dilation, posterior segment examination, and imaging. Dr. Joshi diagnosed Glase with early dry AMD in both eyes. AMD can be classified as dry or wet. Dry AMD consists of deposits on the retina while wet AMD is diagnosed by the presence of vessels leaking blood or fluid and can cause vision loss. Dry AMD can progress to wet AMD.

{¶ 3} Glase was instructed to follow up in one year, but to call the office immediately upon noticing any vision changes. Staff gave him an AMD pamphlet, recommended he take AREDS 2 vitamins, and instructed him on daily use of the Amsler grid.

{¶ 4} Glase returned to the office on October 28, 2021, after noting a sudden vision change in his left eye five days prior. Dr. Joshi diagnosed Glase with very early

---

[1]In his deposition, Dr. Joshi described the Amsler grid as a piece of paper with a grid pattern that aids in uncovering retinal distortion, a potential symptom of wet AMD.

2.

wet AMD and resulting vision loss, and he injected Glase's left eye with EYLEA, a stabilizing treatment that targets a substance produced by wet AMD. When Glase returned the next month, his vision had stabilized and he received a second EYLEA injection. In Dr. Joshi's experience, approximately 90 per cent of the time the injections can stabilize vision within three lines of the eye chart. A patient can be treated with EYLEA injection treatments for several years.

{¶ 5} In December 2021, Dr. Joshi left RVA. Glase received AMD treatment at RVA through March 2022. Glase saw Dr. Ahmed Alkaliby who administered three additional monthly EYLEA injections. From his final appointment with Dr. Joshi on November 29, 2021, to his first visit with Dr. Alkaliby on December 27, 2021, Glase's left-eye vision worsened from 20/100 to 20/400.

{¶ 6} On February 14, 2023, Glase commenced the present action against Dr. Joshi alleging medical negligence and intentional and negligent infliction of emotional distress. Specifically, Glase claimed that Dr. Joshi negligently failed to diagnose and treat his AMD resulting in permanent left-eye vision loss.

{¶ 7} On April 20, 2023, Dr. Joshi moved to dismiss Glase's emotional distress claims in count No. 2, as being duplicative of count No. 1. He explained that Ohio law treats emotional distress claims stemming from medical care and treatment as medical claims. The trial court agreed and dismissed the claims

{¶ 8} Glase filed the October 24, 2023 deposition of his expert, Dr. Robert Bloom, a general ophthalmologist, pediatric fellowship trained, who treats both adults and

3.

children.  Dr. Bloom testified that 40 to 50 per cent of his patients are over 65 years old and that he treats retinal diseases, including AMD.  He stated that approximately 12 per cent of his patients have AMD, most having dry AMD.  Bloom stated that he generally treats his wet AMD patients but will refer a patient to a retina specialist if they do not show improvements following injections.  Taking ER call shifts, Dr. Bloom sees approximately one to two patients weekly with dry AMD that has converted to wet AMD.

{¶ 9} Dr. Bloom opined that Dr. Joshi violated the standard of care by not instructing Glase to return in four to six months for monitoring.  Dr. Bloom addressed questions regarding causation as follows:

> Q: Doctor, as I understand, your one criticism is that he should have seen the patient within four to six months after that initial visit.  If, in fact, Dr. Joshi had seen the patient, that doesn't guarantee that the outcome would have changed in this particular patient?
>
> A: No.  But, again, if he – who's to say?  I mean, a lot of times you'll see those blood vessels form and then you can treat him.
>
> Q: Doctor, can you say in terms of medical certainty and probability that if, in fact, Dr. Joshi had seen the patient within the four to six months, as you had recommended, whether or not the patient's vision would be saved and/or you can't tell me?
>
> A: Well, that's why you do that.  That's the whole point of seeing patients back.
>
> Q: In terms of medical certainty and probability, can you tell me whether or not the patient's vision would have been saved or preserved?
>
> A: You can't.
>
> Q: You don't know.  You can't?

4.

A: You lost that opportunity.

. . .

Q: And you've indicated that even if the patient had been seen by Dr. Joshi at four to six months, you don't know if Dr. – if the outcome would have been any different in this case? . . . [T]he question is, whether it made – can you tell me in terms of certainty and probability whether it would have made a difference, and I think you said before that you cannot answer that question.

A: Well, because you can't – you don't always see it, so you're right. Some people with macular degeneration, you have no clue.

Dr. Bloom agreed that "everything was done appropriately except the follow-up care."

{¶ 10} Dr. Joshi's expert, retina specialist Dr. Suber Huang, testified by affidavit that after reviewing Glase's complaint and affidavit of merit, deposition, and RVA medical records, in his opinion, made with "the highest degree of medical certainty," Dr. Joshi "met or exceeded the standard of care" in Glase's diagnosis and treatment. Dr. Huang stated that during Glase's December 3, 2020 initial visit there were no signs or symptoms warranting treatment and that a follow-up interval of one year was appropriate.

{¶ 11} Dr. Joshi moved for summary judgment on the basis that Glase failed to provide expert testimony supporting the elements of his claim, especially causation. While the motion was pending, Joshi moved to exclude Glase's expert Dr. Robert Bloom's deposition testimony asserting that as a pediatric ophthalmologist he was not qualified under Evid.R. 601(B) to render an expert opinion as to whether Dr. Joshi, a retinal specialist, violated the standard of care.

5.

{¶ 12} Opposing the summary judgment motion, Glase attached the March 2024 affidavit of Dr. Robert Bloom. Bloom stated that during his deposition, he incorrectly interpreted the language used by defendant's counsel while questioning him regarding causation as meaning an "absolute certainty." Bloom clarified his opinion stating:

> I can say, in my professional opinion, and within a reasonable degree of medical certainty (that it is more likely than not) that if the Defendant would have applied the applicable standard of care to Jeff Glase that his eyesight would have been saved or preserved. This is offered more in depth in my Expert Report, but I wanted to provide this deposition clarification to the Court.

{¶ 13} Dr. Bloom's February 22, 2024 expert report similarly opined that Dr. Joshi's failure to properly treat Glase's ongoing and worsening symptoms caused his permanent vision loss. Dr. Bloom specified that Dr. Joshi violated the medical standard of care by failing to examine Glase every four to six months "in order to prevent Wet Macular Degeneration (WMD) and subsequent vision loss."

{¶ 14} Dr. Joshi then moved to exclude Dr. Bloom's affidavit on the basis that the new opinion contradicted his prior deposition testimony. Joshi claimed that Dr. Bloom expressed no confusion during his deposition, that he had a significant period of time to review and correct any errors or omissions, and that the claim came only after Joshi filed his summary judgment motion.

{¶ 15} Glase opposed the motions. As to the motion to exclude Dr. Bloom's testimony, Glase explained that Dr. Bloom practices in the same field as Dr. Joshi, that he treats patients with both dry and wet AMD and, specifically, treats one to two patients per week with wet AMD. He also performs EYELA injections.

6.

{¶ 16} Glase's opposition to Dr. Joshi's motion to exclude Dr. Bloom's subsequent expert report and affidavit asserted that the testimony did not contradict his deposition testimony, rather, it clarified or expanded his opinions. Glase stated that during his deposition, defense counsel confused Bloom by using the term "medical certainty;" this confusion resulted in Dr. Joshi's misrepresentation of his deposition testimony to support his summary judgment motion. Glase stated that the clarification demonstrates Dr. Bloom's belief that, to a more likely than not- reasonable degree of medical certainty standard, the lack of proper follow-up care caused his wet AMD to go undiagnosed, causing his left eye central vision loss.

{¶ 17} The trial court jointly considered all three motions. Granting Dr. Joshi's motion to exclude Dr. Bloom's expert testimony, the court determined that Dr. Bloom did not qualify as an expert witness under Evid.R. 601 and/or Evid.R. 702. As to Evid.R. 601(B)(5)(a), the court found that Dr. Bloom's testimony failed to demonstrate that he practices in a "substantially similar specialty" as Dr. Joshi. Under Evid.R. 702, that he lacked "specialized training and expertise in the treatment of the retina."

{¶ 18} The court noted that because Bloom is a general ophthalmologist, not a retinal specialist, and he refers any cases he is not comfortable with to a retina specialist, he lacked knowledge of the proper standards for treating AMD, and he provided no standard of care evidence supporting his preference to treat patients more "conservatively." The court stated:

> To the extent Bloom attempted to broaden the basis of his opinions, or
> better explain them with his expert report, those opinions necessarily rest

7.

on specialized knowledge, education, and/or training specific to the etiology, progression, and available treatments for MD. However, Bloom's testimonies, taken as a whole, still bely any specific education or training on his part related to retinal specialist's treatment of MD patients, particularly those converting from dry to wet such as Plaintiff's case, and those presenting with wet MD.

{¶ 19} The court then found that Dr. Joshi's motion to exclude Dr. Bloom's "new" and contradictory opinion was moot and granted Dr. Joshi's summary judgment motion finding that he met his Civ.R. 56 burden and that Glase failed to meet his reciprocal evidentiary burden. This appeal followed.

## II. Assignments of Error

{¶ 20} Glase raises three assignments of error:

1. The Trial Court erred in granting Appellee's Motion to Exclude Appellant's Expert Witness by finding that Appellant's expert was not qualified or competent under Evid.R. 601 and Evid.R. 702 of rendering an expert opinion under the circumstances in this specific case because Appellant's expert practices in the same medical specialty as Appellee and the expert is substantially familiar with the health care matter at issue, which is macular degeneration.

2. The Trial Court erred by not addressing the "missing medical records" relevant to Appellant's claims and this should have been construed in Appellant's favor when considering the competency of Appellant's expert opinion.

3. The Trial Court erred by granting Appellant's Motion for Summary Judgment under Civ.R. 56(C) because Appellant has a right to have his claims heard by a jury and a more appropriate ruling would have been to allow Appellant additional time to produce additional experts before deciding the Motion for Summary Judgment.

## III. Analysis

## A. Glase's Expert's Qualifications

{¶ 21} In his first assignment of error, Glase asserts that the trial court erred by granting Dr. Joshi's motion to exclude the testimony of his expert, Dr. Robert Bloom. Glase contends Dr. Bloom qualifies as an expert in a substantially similar field because he practices as a full-time ophthalmologist who treats both dry and wet AMD. Dr. Joshi counters that because Dr. Bloom is not a retina specialist, he is not qualified to testify against him.

{¶ 22} A trial court has discretion in determining the competency of an expert witness and the court's decision will not be reversed absent a clear showing of an abuse of its discretion. *Waechter v. Laser Spine Inst., LLC*, 2023-Ohio-3715, ¶ 39 (8th Dist.), quoting *Celmer v. Rodgers*, 2007-Ohio-3697, ¶ 19.

{¶ 23} Evid.R. 702 provides that a witness may testify as an expert if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

9.

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 24} Because Dr. Bloom expressed an opinion regarding Dr. Joshi's liability, Evid.R. 601(B)(5) also requires that prior to testifying

in any medical claim, as defined in R.C. 2305.113, asserted in any civil action against a physician, podiatrist, or hospital arising out of the diagnosis, care, or treatment of any person by a physician or podiatrist, unless all the following apply:

(a) The person testifying is licensed to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery by the state medical board or by the licensing authority of any state;

(b) The person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school, at either the time the negligent act is alleged to have occurred or the date the claim accrued;

(c) The person practices in the same or a substantially similar specialty as the defendant. The court shall not permit an expert in one medical specialty to testify against a health care provider in another medical specialty unless the expert shows both that the standards of care and practice in the two specialties are similar and that the expert has substantial familiarity between the specialties.

If the person is certified in a specialty, the person must be certified by a board recognized by the American board of medical specialties or the American board of osteopathic specialties in a specialty having acknowledged expertise and training directly related to the particular health care matter at issue.

{¶ 25} A nonspecialist is qualified to testify as an expert where he or she is familiar with the procedure used by the specialist. *Steele v. Buxton*, 93 Ohio App.3d 717, 719 (3d. Dist. 1994). The general admissibility test is whether a particular witness offered as an expert will aid the trier of fact in the search for the truth, not whether the expert witness is the best witness on the subject. *Id.,* citing *Alexander v. Mt. Carmel Med. Ctr.* 56 Ohio St.2d 155, 158-159 (1978) The admissibility of expert testimony must be made on a case-by-case basis, reviewing the medical expert's knowledge, skill, experience, training, and education. *Smith v. ProMedica Health Sys., Inc.*, 2007-Ohio-4189, ¶ 17 (6th Dist.), citing *Taulbee v. Dunsky*, 2003-Ohio-5988, ¶ 21 (12th Dist.).

{¶ 26} In *Schmidt v. Crayne*, 2024-Ohio-4726 (6th Dist.), a medical malpractice case involving a fatal post-surgical lung infection, this court recently examined whether an infectious disease specialist could provide expert testimony in an action involving a pulmonologist's diagnosis and treatment of pneumonia. Answering affirmatively, we noted:

> Both infectious disease and pulmonology specialists diagnose and treat pneumonia, and both are knowledgeable about the risks and benefits of prescribing antibiotics to treat respiratory infections. [The expert] specifically testified that the scope of his practice overlaps with pulmonology. Given that both infectious disease and pulmonology specialists are consulted and treat patients with respiratory infections, including pneumonia, under the circumstances of this case, we find that [the expert] was qualified to provide opinions with respect to [defendant physicians'] treatment of [the decedent].

*Id.* at ¶ 162, citing *Alexander* at 158. *See Johnson v. Emergency Physicians of Nw. Ohio at Toledo, Inc.*, 2013-Ohio-322, ¶ 44-45 (6th Dist.) (An emergency medicine doctor

11.

could provide expert testimony as to whether a urologist negligently failed to communicate with emergency room physicians.); *Smith v. ProMedica Health Sys., Inc.*, 2007-Ohio-4189, ¶ 20 (6th Dist.) (In a malpractice action against a general surgeon, an internist is qualified to provide an expert opinion regarding post-surgical cough treatment.); *Bender v. Durrani*, 2024-Ohio-1258, ¶ 87 (1st. Dist.) (A radiologist could offer an expert opinion regarding whether surgery was medically indicated.); *Guiliani v. Shehata*, 2014-Ohio-4240, ¶ 46 (1st. Dist.) (An oncologist was qualified to render a standard of care opinion for a radiation oncologist.); *Schutte v. Mooney*, 2006-Ohio-44, ¶ 35 (2d Dist.) (A vascular surgeon could testify as to the standard of care of an emergency room physician in the diagnosis of DVT.).

{¶ 27} Here, as set forth above, Dr. Bloom and Dr. Joshi are both ophthalmologists.  Dr. Joshi specializes in retinal diseases while Dr. Bloom, though he completed a pediatric fellowship, practices general ophthalmology.  Bloom treats both adults and children. Nearly half of Dr. Bloom's patients are over 65 years old and he treats retinal diseases, including AMD.  Treatment includes monitoring and providing EYELA injections for wet AMD patients.  As an on-call ER ophthalmologist, Dr. Bloom sees approximately one to two patients weekly with dry AMD that has converted to wet AMD.

{¶ 28} Accordingly, upon review of Dr. Bloom's training, experience and education, we conclude that Dr. Bloom's specialty is substantially similar to Dr. Joshi's and the trial court abused its discretion in its narrow construction of the bases for expert

12.

qualification. The persuasiveness of Dr. Bloom's opinion is a matter to be resolved by the trier of fact. Glase's first assignment of error is well-taken.

## B. Missing Medical Records

{¶ 29} Glase's second assignment of error contends that for purposes of considering the competency of Dr. Bloom, the trial court erroneously failed to construe in his favor the absence in the record of the October 28, 2021 OCT scans and angiography images which formed the basis of Dr. Joshi's claim that the conversion from dry AMD to wet AMD was sudden and not previously discoverable. Glase points to a discrepancy between Dr. Joshi's deposition testimony and the October 28 written report regarding the stage of Glase's wet AMD and whether it could have been discoverable at the six-month mark. Glase suggests that the records were intentionally withheld or "lost" as OCT/angiography images from December 2020 were provided during discovery.

{¶ 30} Dr. Joshi cites Dr. Bloom's reference to the records during his deposition suggesting that they were reviewed and that, regardless, Dr. Joshi did not have control or possession of the records after his December 2020 departure from RVA. He contends that any discussion of what the images would show is purely speculative and not a proper basis on which to deny summary judgment. This court agrees.

{¶ 31} Beyond bare assertions that the records were intentionally withheld or destroyed Glase has provided no compelling reason for construing records, out of Dr. Joshi's control and possession, in his favor. Glase's second assignment of error is not well-taken.

13.

## C. Summary Judgment

{¶ 32} Glase's third and final assignment of error is that the trial court erred by granting summary judgment in favor of Dr. Joshi. An appellate court reviews the grant or denial of a motion for summary judgment de novo, applying the same standard as the trial court. *Crawford v. Bellevue Hosp.*, 2023-Ohio-2709, ¶ 37 (6th Dist.), citing *Bliss v. Johns Manville*, 2022-Ohio-4366, ¶ 12. Under Civ.R. 56(C), a trial court shall grant summary judgment only where (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Id.*

{¶ 33} In proving a medical negligence or malpractice claim, a plaintiff must first define the duty by stablishing the applicable standard of care, usually through expert testimony. *Miller v. Toledo Hosp.*, 2017-Ohio-2691, ¶ 12 (6th Dist.), citing *Starkey v. St. Rita's Med. Ctr.*, 117 Ohio App.3d 164, 169, (3d Dist.1997); *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976). Additionally, "'[a] medical-malpractice claim requires the plaintiff to "prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence."'" *Bolen v. Mohan*, 2017-Ohio-7911, ¶ 15 (9th Dist.), quoting *Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 2009-Ohio-2460, ¶ 11 (9th Dist.), quoting *Roberts v. Ohio Permanente Med. Group, Inc.*, 76 Ohio St.3d 483, 485 (1996). "'An event is probable if there is a greater than fifty percent likelihood that it produced the occurrence

14.

at issue.'" *Id.*, quoting *Stinson v. England*, 69 Ohio St.3d 451 (1994), paragraph one of the syllabus.

{¶ 34} Because the trial court based its decision awarding Dr. Joshi summary judgment on its finding that Glase failed to provide expert testimony in support of his claims, the question of whether the substance of Dr. Bloom's deposition and, particularly, his subsequent affidavit and report were sufficient to create a genuine issue of fact as to Dr. Joshi's negligence remains unanswered.

{¶ 35} To fully address this question, the trial court first needs to determine the admissibility of Dr. Bloom's subsequent affidavit and expert report. This court observed: "Ohio law provides that when the affidavit of a nonparty, retained expert submitted under Civ.R. 56(C) conflicts without explanation with a prior deposition on material facts, the affidavit may not act to create a genuine issue preventing summary judgment."

*Crawford,* 2023-Ohio-2709, at ¶ 41, citing *Pettiford v. Aggarwal*, 2010-Ohio-3237, ¶ 41.

> But where more recent testimony merely explains, supplements, or clarifies the earlier testimony rather than contradicts it, it may be considered to create a genuine issue of material fact sufficient to defeat a motion for summary judgment. *Purcell v. Norris*, 10th Dist. Franklin No. 04AP-1281, 2006-Ohio-1473, ¶ 12, citing *Medina v. Harold J. Becker Co., Inc.*, 163 Ohio App.3d 832, 2005-Ohio-5438, 840 N.E.2d 1112, ¶ 27. Whether an expert's more recent testimony contradicts his or her prior deposition testimony is a question of fact for the trial court to resolve. *Duck v. Cantoni*, 4th Dist. Washington No. 11CA20, 2013-Ohio-351, ¶ 32, citing *Pettiford* at ¶ 40. So too is the issue of whether a sufficient explanation has been offered for the conflict. *Pettiford* at ¶ 40.

*Dazley v. Mercy St. Vincent Med. Ctr.*, 2018-Ohio-2433, ¶ 37 (6th Dist.)

15.

{¶ 36} In *Dazley*, a medical negligence case stemming from the death of a cardiac intensive care patient, plaintiff's medical expert provided depositions in 2015, and in 2017, after plaintiff dismissed and refiled the case. In the 2015 deposition, the expert focused his criticisms on the attending physician. *Id.* at ¶ 16. The 2017 deposition, taken after the attending physician exited the lawsuit, criticized the defendant resident's communications with the cardiologist. *Id.* at ¶ 22.

{¶ 37} Defendants filed a motion in limine to limit the expert's testimony claiming that the opinions expressed in the 2017 deposition deviated from those in his 2015 deposition and could not be used to create an issue of fact. *Id.* at ¶ 25.

{¶ 38} The trial court awarded summary judgment finding that the plaintiff failed to establish by expert testimony any articulable standard of care relating to communications between emergency medical providers and cardiologists. *Id.* at ¶ 29. It deemed the motion in limine moot. *Id.* at ¶ 30.

{¶ 39} On review, we concluded that the trial court implicitly resolved the issue by analyzing the facts in relation to the later, 2017 testimony. *Id.* at ¶ 38. The court then determined that the court properly considered the later deposition testimony. *Id.* at ¶ 39.

{¶ 40} In the present case, unlike *Dazley*, the trial court did not "implicitly" consider the subsequent affidavit and report for any purpose other than determining Dr. Bloom's qualifications as an expert witness under Evid.R. 601 and 702. Because the trial court, as the trier of fact, did not, in its discretion, determine whether Dr. Bloom's subsequent documents were contradictory and without sufficient explanation, the matter

16.

must be remanded for the court to engage in the proper analysis. *Pettiford,* 2010-Ohio-3237 at ¶ 40.

{¶ 41} Accordingly, because the trial court granted summary judgment without fully considering the admissibility of and whether Dr. Bloom's expert testimony is sufficient to create an issue of fact, Glase's third assignment of error is well-taken.

## IV. Conclusion

{¶ 42} On due consideration, the judgment of the Lucas County Court of Common Pleas is reversed and the matter remanded for further proceedings. Pursuant to App.R. 24, Joshi is ordered to pay the costs of this appeal.

Judgment reversed<br>and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                                     _____
                                                                JUDGE

Myron C. Duhart, J. _____

Charles E. Sulek, P.J.                                _____
CONCUR.                                                                 JUDGE

                                                            _____
                                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.